No. 22,651.

THE STATE OF KANSAS, ex rel. RICHARD J. HOPKINS, as Attorney-general, etc., *Plaintiff*, v. P. T. FOLEY, as Mayor of the City of Parsons, *Defendant*.

No. 22,652.

THE STATE OF KANSAS, ex rel. RICHARD J. HOPKINS, as Attorney-general, etc., *Plaintiff*, v. F. N. BOYD, as Police Judge of the City of Parsons, *Defendant*.

SYLLABUS BY THE COURT.

1. QUO WARRANTO—*Ouster of Public Official—Findings and Conclusions of Special Commissioner Advisory Only.* In an action originating in this court, when a special commissioner is appointed to take the testimony and to make findings of fact and conclusions of law, the commissioner's findings, if exceptions are taken thereto, are only advisory, and the court itself must examine all the testimony, and determine for itself the truth of the matters given in evidence, and the weight and significance to be attached thereto, as well as to determine the correct judgment to be entered.

2. SAME—*Ouster of Public Officials—Good Faith of Officer Charged the Determining Factor.* In quo warranto, where forfeiture of a public office is demanded by the state on charges of willful misconduct in office or willful neglect of official duty, the paramount consideration in scrutinizing the acts of the defendant officer is whether they bear the distinguishing characteristics of genuine good faith, not whether those acts are technically free from error when viewed under rigid and critical scrutiny.

3. SAME—*Evidence Fails to Establish Willful Misconduct or Willful Neglect of Duty.* The record examined, and held that it does not establish the state's charges of willful misconduct in office or willful neglect of duty on the part of the defendants.

Original proceedings in quo warranto. Opinion filed November 6, 1920. Judgment for defendants.

*Richard J. Hopkins*, attorney-general, *J. K. Rankin*, and *C. A. Matson*, assistant attorneys-general, for the plaintiff.

*J. J. Jones*, of Chanute, *W. S. Hyatt*, and *E. L. Burton*, both of Parsons, for the defendants.

The State, *ex rel.*, v. Foley.

The opinion of the court was delivered by

DAWSON, J.: These are original preceedings in quo warranto to forfeit the offices of the mayor and police judge of the city of Parsons.

The state charged Mayor P. T. Foley with willful misconduct in office and neglect of duty, in that he failed to notify the county attorney of violations of the prohibitory law of which he had knowledge, that he sanctioned a system of fines on violators of that law for the mere purpose of raising revenue for the city, that he personally profited from contracts awarded by the city for official city printing, and that he overdrew his official salary.

The first two of these charges were also directed against Police Judge F. N. Boyd.

The evidence to support the charges against these officials was presented as one case, so far as applicable, before Honorable Thomas Harley, of Lawrence, specially commissioned by this court with authority to hear the evidence, and to make findings of fact and conclusions of law. Commissioner Harley's findings in the Foley case read:

"FINDINGS OF FACT.

"I. That said P. T. Foley is now and has been ever since the first of January, 1919, the duly elected, qualified, and acting mayor of the city of Parsons, Labette county, Kansas. That said city of Parsons is a city of the first class, with a population of approximately 18,000, and adopted the commission form of government in 1910.

"II. That the Parsons Daily *Eclipse*, of which C. A. Lamb is the owner, editor, and publisher, was, on or about the first day of March, 1919, made the official city paper of the city of Parsons and has been such official city paper at all times since that date. And as such official paper, has published all the official notices and ordinances required by law to be published since that date in an official city paper.

"III. That neither said defendant, P. T. Foley, nor the Foley Railway Printing Company has had anything to do with the printing of such official publications as are required to be published in an official city paper, nor have they, or either of them, derived any profit therefrom.

"IV. That on or about the —— day of January, 1919, one F. W. Frye, who was the city clerk of said city, was designated by the city as its purchasing agent and since said date has made all the contracts for job printing for said city of Parsons.

"V. That said F. W. Frye, as said purchasing agent for said city of Parsons, ordered from time to time from said C. A. Lamb certain forms,

39—107 Kan.

blanks and other printing, and the said C. A. Lamb presented bills to the city of Parsons, Kan., for the same, which bills were allowed and warrants drawn on the treasurer in payment thereof. Said warrants were drawn to the order of said C. A. Lamb, and with one or two exceptions were endorsed by him and delivered to the Foley Railway Printing Company and by said company credited on the account of the said C. A. Lamb. Practically all the forms, blanks, and job printing for which warrants were issued was done by the Foley Railway Printing Company, which had been doing that class of work for Mr. Lamb for a number of years. That in each instance the Foley Railway Printing Company charged the personal account of the said C. A. Lamb for said forms, blanks or job printing from the city. But it was understood and agreed between the said C. A. Lamb and the said Foley Railway Printing Company that when said C. A. Lamb paid his account in full he was to have a discount on the entire bill of fifteen (15) per cent, the same being the estimated profit on the business.

"VI. The Foley Railway Printing Company is a corporation organized under the laws of this state with a capital stock of $10,000 divided into 100 shares with a par value of $100 each. Originally said P. T. Foley was the owner of 95 shares of said stock. Sometime, on or about the first day of January, 1919, said P. T. Foley gave to his wife all the shares of stock owned by him in said printing company and severed his connection with said company and ceased to have or take any interest in said company, except such an interest as a husband would naturally have or take in a property in which his wife owned a controlling interest.

"VII. Said P. T. Foley was the publisher and owner of the Parsons *Republican* between the dates of January 1, 1919, and October 13, 1919. That between said dates bills and claims from every source owned by said Parsons *Republican* were paid by the Foley Railway Printing Company, and an account was kept in the books of said printing company showing the amount due from said Parsons *Republican*. That during the dates last mentioned there had been no payment made on said account and no payment had been demanded by the Printing Company or tendered by Mr. Foley to said Printing Company.

"VIII. Said P. T. Foley during all the time that he has been mayor of the city of Parsons has, together with the other officers of said city, vigorously enforced all the ordinances of said city, including those relating to intoxicating liquors. That during the term of office of said P. T. Foley a number of complaints were filed in the police court of said city in which persons were charged with illegally having intoxicating liquors in their possession, under an ordinance passed by said city following what is commonly known as our 'bone-dry' law. None of said defendants were charged with the sale of intoxicating liquors. With a few exceptions all of said defendants were nonresidents of the state of Kansas. The said defendant reported to the county attorney of said county of Labette all resident offenders who were charged with violating the 'bone-dry' law, of whom the defendant had knowledge, giving to said county attorney the names of the officer or officers making the arrest,

The State, *ex rel.*, v. Foley.

said report being made sometimes over the telephone, sometimes by going in person to the office of the county attorney, and at other times by having the county attorney come to the office of said defendant. None of said reports were in writing. Said defendant has been advised by the county attorney of said county that it was his opinion, and the opinion of the judge of the district court of that county, that persons going through the state having intoxicating liquors in their possession were not guilty of an offense against the laws of the state of Kansas. Said defendant, believing that to be the law, talked to the county attorney from time to time in regard to the nonresidents carrying liquors through the state, and gave said county attorney the names of those parties of whom he, the defendant, had knowledge, and talked over these cases in an informal manner with the county attorney.

"IX. That the said P. T. Foley was paid the sum of $133.33 per month as salary as mayor of the city of Parsons, from February 1, 1919, to October 1, 1919. Prior to December 10, 1918, the salary of mayor of the city of Parsons was fixed at the sum of $1,200 per annum, payable monthly. On December 9, 1918, an ordinance was passed which was published on December 10, 1918, attempting to fix the salary of mayor of Parsons at $1,600 per annum. Section 6 of said ordinance provided: that said ordinance will take effect after its ratification by the Kansas legislature. That the said P. T. Foley, shortly after assuming the duties of mayor of the city of Parsons wrote to the attorney-general of the state of Kansas, and to the district judge of Labette county, inquiring of them as to the amount of salary he was entitled to draw as mayor. He then consulted with the city attorney, Mr. T. M. Brady, who advised him that he was entitled to draw a salary of $1,600 per annum. Said defendant, P. T. Foley, relying on said advice, collected from said city the said sum of $133.33 per month as salary as mayor.

"X. That it is a well and generally known policy of the police court of the city of Parsons to parole all persons convicted for the first time of illegally having intoxicating liquor in their possession, immediately upon payment of fine and costs. That notes are frequently accepted by the police court in lieu of cash payment of fine and costs. These notes are not only accepted in intoxicating liquor cases, but in other cases. That said system of taking notes had been in vogue in said city for some time prior to the election of P. T. Foley as mayor. That system and plan was approved by said P. T. Foley as being the best way to handle offenders. It was not used as a form of licensing the traffic in intoxicating liquor, but, on the contrary, all liquor found was destroyed and persons arrested were compelled to either leave the city or quit violating the liquor law.

"XI. That during all the time of the administration of the said P. T. Foley as mayor of the city of Parsons, Kan., the said mayor, police judge, city attorney and police officers were in constant touch with the county attorney of said county and worked together harmoniously, and diligently endeavored to enforce all the ordinances of the city of Parsons, and all the laws of the state of Kansas within their several jurisdictions.

"CONCLUSIONS OF LAW.

"I. That said defendant has not knowingly, intentionally, or willfully violated any law of the state of Kansas.

"II. That said P. T. Foley should not be ousted from his office as mayor of the city of Parsons, Kan.

"III. That the state should pay the costs of this action taxed at $———.                    THOMAS HARLEY, *Commissioner*."

The commissioner's findings in the case against the police judge read:

"FINDINGS OF FACT.

"I. That said F. N. Boyd is now and has been ever since the 7th day of January, 1919, duly appointed, qualified and acting police judge of the city of Parsons, Labette county, Kansas.

"II. That the said F. N. Boyd from April 16, 1919, to September 4, 1919, had thirty-eight (38) cases before him as judge of the police court, in which persons were charged with illegally having intoxicating liquor in their possession, under an ordinance passed by said city following what is known as the 'bone-dry' law of this state. In nearly every case the parties or party arrested plead guilty, and a fine and jail sentence was imposed in a manner provided by the ordinance. That in all cases where the defendant or defendants, was or were, a resident of this state said police judge notified the county attorney of said county of the arrest, the name of the defendant or defendants, and the names of the arresting officers, but none of these were made in writing. That in those cases where the defendant or defendants were nonresidents of the state of Kansas, the said police judge as a rule advised the county attorney of the name of the defendant, or defendants, and the arresting officers, but in a number of cases this was not done, as the said F. N. Boyd has been advised by the county attorney of said county that it was his opinion, and the opinion of the judge of the district court of said county, that persons going through the state having intoxicating liquor in their possession were not guilty of an offense against the laws of the state of Kansas. Said defendant, believing that to be the law and believing that it was unnecessary to report that class of offenders to the county attorney, was not as particular in making these reports as he was where the defendant, or defendants, was or were residents of this state.

"III. Said defendant, as police judge of the city of Parsons, paroled for the first offense persons convicted of illegally having intoxicating liquor in their possession immediately upon payment of fine and costs assessed therein, and in one case paroled the defendant for the second offense. Notes were frequently accepted by the police judge in lieu of cash payment of the fine and costs. These notes were not only accepted in intoxicating liquor cases, but in many other cases, and the defendant was allowed to make partial payments. Said system of taking notes has been in vogue in said city for a number of years prior to the appointment of Mr. Boyd as police judge. There was no attempt on the part of Mr.

The State, *ex rel.*, v. Foley.

Boyd as police judge to license the traffic of intoxicating liquor, but on the contrary all intoxicating liquor found was destroyed. Said defendant has, at all times since he has been police judge of said city, performed the duties of his office in a fair and impartial manner, exercising the discretion conferred upon him by law.

"CONCLUSIONS OF LAW.

"I. Said defendant has not knowingly or willfully violated any laws of the state of Kansas.

"II. Said defendant, F. N. Boyd, should not be ousted from his office as police judge of the city of Parsons, Kan.

"III. That the state should pay the costs of this action, taxed at
$———.                          THOMAS HARLEY, *Commissioner*."

The state filed general exceptions to the commissioner's findings of fact; and therefore, as these are only advisory and do not have the binding force which attach, on appeal, to like findings of a trial court, when the latter's findings are supported by substantial though controverted and conflicting testimony, the court itself must examine all the testimony, and determine for itself the truth of the matters given in evidence, and the weight and significance to be attached thereto, as well as to determine the correct judgment which must be entered. (*Wideman v. Faivre,* 100 Kan. 102, 106, 107, 163 Pac. 619.)

In *Hunt v. Gibson,* 99 Kan. 371, 375, 161 Pac. 666, it was said:

"Each party challenges the findings of fact and conclusions of law adverse to him. If those which are adverse to the defendant be approved they determine the case. Being challenged, the commissioner's findings are advisory only. In the solution of doubtful questions of fact, some weight may be given them because the commissioner had the advantage of personal observation of the witnesses while they were undergoing examination. With this exception the court considers the evidence as though it had been taken by deposition."

We have therefore perused with care the abstract of the record, consisting of some one hundred and fifty printed pages prepared by counsel for the state. We have also resorted to the still more voluminous transcript itself. Throughout this research we have kept a sharp lookout for evidence bearing not only on the mere question whether certain official acts of these defendants, under critical scrutiny, could be construed as a dereliction of official duty, but for evidence bearing on the question of the defendants' sincerity and good faith in the discharge of their duties as mayor and police judge of Parsons.

The act providing for the removal of unfaithful public officers was not designed as a pitfall into which an honest and sincere public official might be plunged if he unintentionally erred in the discharge of his official duty. The first section of the ouster act provides:

"Every person holding any office of trust or profit, under and by virtue of any of the laws of the state of Kansas, either state, district, county, township or city office, who shall willfully misconduct himself in office, or who shall willfully neglect to perform any duty enjoined upon such officer by any of the laws of the state of Kansas, or who shall in any public place within or without the state be in a state of intoxication produced by strong drink voluntarily taken, or who shall engage in any form of gambling, or who shall commit any act constituting a violation of any penal statute involving moral turpitude, shall forfeit his office and shall be ousted from such office in the manner hereinafter provided." (Gen. Stat. 1915, § 7603.)

Willful misconduct in office, willful neglect of duty, are the vices for which this statute provides a summary remedy. In *The State v. Trinkle,* 70 Kan. 396, 402, 78 Pac. 854, in which the state sought the removal of a county attorney for nonenforcement of the prohibitory law, it was said that the distinguishing characteristic of every official act must be genuine good faith, and that the law presumes that a public official thus conducts himself, and that "the burden rests upon the state to show the contrary to be true, by a preponderance of the evidence."

Tested by this rule, the state has failed to establish its case against either of the defendants. There is no convincing or substantial evidence in the record of *willful* official misconduct or *willful* neglect of official duty on the part of either defendant. There was no failure on the part of either of the defendants to notify the county attorney of violations of the prohibitory law as required by section 5505 of the General Statutes of 1915, so far as local resident offenders were concerned.

The city of Parsons is a railway center of considerable importance, a much traveled gateway between Oklahoma and certain large Missouri towns on our eastern border. Many persons not residents of Parsons carry liquor to and from Missouri and Oklahoma and are occasionally picked up by the police officers of Parsons. The county attorney held the opinion—whether correctly or not is immaterial—that these in-

The State, *ex rel.*, v. Foley.

terstate travelers carrying liquors were not violating the Kansas state law in so doing. He so advised the defendants, and consequently he was not notified of these "pick-up" cases. Such failure of notification did not constitute willful misconduct in office nor willful neglect of duty.

The evidence to support the charge that the defendants were conducting the police-court business of Parsons as a mere revenue-producing system and not primarily for the suppression of crime cannot be sustained. The chief item of evidence to support that charge appears to be the publication of an article, by Mayor Foley in a newspaper owned by him, showing in a somewhat boastful way that his administration of the mayoralty was a financial success. In part it reads:

### "A BUSINESS ADMINISTRATION.

"Once more has it been thoroughly demonstrated that it pays to have a business man at the head of the city government. Certainly the people want a business man, one who knows and talks the Kansas language—to look after their affairs of state. The record of the present city administration for the first five months of the year is one in which every voter of the city may take especial pride. In order that you may know how the affairs of the city are getting on we offer you here a few words of comparison between this and former administrations:

"On the first of January, 1918, the former mayor had a balance on hand in the general fund of.................... $22,854.48
"On the first of June, 1918, the former mayor had a balance on hand in the general fund of........................ 12,639.70

.    .    .    .    .    .    .    .    .    .    .    .    .

"On the first day of January, 1919, the present mayor had a balance in the general fund of......................... 23,812.41
"On the first day of June, 1919, the present mayor had on hand a balance in the general fund of................... 19,550.54

.    .    .    .    .    .    .    .    .    .    .    .    .

"Of course, this does not represent the total amount of money used to run the affairs of the city, but it does show exactly the amount of moneys that were drawn from the general fund, and also shows very clearly that the present city administration has so conducted the affairs of the city as to save the taxpayers almost six thousand dollars in five months. At this ratio the total saving would amount to about $15,000 the year. Another item that shows an increase over the old administration is that of dog taxes. The figures will show that during the administration of the former mayor but $494.50 were collected during the year for dog taxes, while the present administration has already collected the sum total of $1,154.50, a difference of almost seven hundred dollars in dog taxes alone. The American people respect and admire a man who knows how to do things, and who goes ahead and does them, and the records of the present

city administration speak for themselves. At the rate above mentioned, $15,000 a year, in the two-year term of office, it would net a saving of some $30,000 to the taxpayers of this city. We say it again—a business administration pays, after all."

Just how much laudation a public official may bestow on himself through the columns of his own newspaper is perhaps primarily a question of good taste. It has, too, its political aspects, no doubt. Be that as it may, the article in question has not the slightest value either as evidence, confession, or admission that the defendants had perverted the prosecution and punishment of lawbreakers into a means of raising revenue for the city, although an active and diligent campaign against offenders might possibly and temporarily produce such a result.

If there is any lack of energy or sincerity in law enforcement by public officials, two classes of people very soon make that discovery—the lawbreakers, and the leaders of the moral sentiment of the community. Neither of these classes is readily fooled for any considerable length of time. Of the latter class is the Ministerial Alliance of the city of Parsons, which concerns itself particularly with the enforcement of the prohibitory law. The Rev. Robert E. MacLean, minister of the local Methodist church, and a member of that alliance, testified:

"Q. From your investigation during the time that you have been in the city of Parsons during the Foley administration, have you a judgment or opinion as to whether or not the officers of this city, including Police Judge Boyd, have vigorously enforced the prohibitory law? You have an opinion on that subject? A. Yes sir, I have.

"Q. I wish you would state that opinion to the court. . . .

"Q. Have they or have they not vigorously enforced the law? A. I consider that they have, vigorously. You refer to the prohibitory liquor law especially?

"Q. Yes, sir. A. Yes."

The Rev. Stado Munneke, minister of the local Presbyterian church, also a member of the alliance, testified:

"*Direct Examination.*

"Questions by Mr. Burton: . . .

"Q. Does such alliance and do the ministers of the city keep track in a general way as to whether or not the prohibitory liquor law is enforced in the city of Parsons, keep informed on that subject in a general way? A. Yes, sir; so far as we know. . . .

The State, *ex rel.*, v. Foley.

"Q. From the information you have received, have you an opinion, Mr. Munneke, as to whether or not the officers of the city of Parsons during the administration of P. T. Foley as mayor, have vigorously enforced the prohibitory law; have you an opinion on that subject? A. I have.

"Q. Have they or have they not vigorously enforced that law, in your opinion? . . . A. I think they have.

"*Cross-examination.*

"Questions by Mr. Matson: . . .

"Q. Some members of the official city family here are members of your church, are they not? A. I think not, no.

"Q. Mr. Boyd a member of your church? A. No sir.

"Q. You were a supporter of Mr. Foley's, were you, in the election? A. I was not.

"Q. You are for him now? A. I am, yes sir. . . .

"Q. The information you have in regard to the enforcement of the prohibitory liquor law is the information that came to the Ministerial Association. A. No, it came to us rather as individuals."

The testimony of Mrs. Kate Southwick, who is a local welfare worker, and of the county attorney himself, was to the same effect.

Passing to the charge that Mayor Foley profited personally in the matter of letting contracts for the city printing, it is clear from the record that when Mr. Foley was elected mayor of Parsons, he determined to retire from the presidency of the Foley Railway Printing Company and to dispose of his stock in that concern. That he did so is conclusively shown by the evidence. That he signed the corporation's report to the secretary of state for the year 1918 after he became mayor in 1919 does not materially affect the conclusive character of the evidence. Foley was president of the printing company in the year 1918, and he assumed that the corporation's report for that year was but a part of the unfinished business of the corporation which it was his duty to discharge. That Mr. Foley also signed a contract with the local labor union in 1919 was satisfactorily explained. Mr. Foley had been an opponent of the union. When his wife succeeded to his interests in the printing company she was not disposed to continue the strife, and it was at her request and also to gratify the labor union that Foley signed the labor-union contract. While this might well conclude this feature of the case against Mayor Foley, we note, also, that the printing company itself did not profit from

its subcontract with the man who had been awarded the city printing. By agreement the work was done for him at cost, the usual profit being remitted.

Passing then to the charge that the mayor exacted a larger salary than authorized by law: It is very difficult to say what is the authorized salary of the mayor of Parsons. He drew $133.33 per month. An ordinance, prior to Foley's assumption of the mayoralty, prescribed a salary of $1,600 per annum. The law authorized a salary of that amount or more. The defendant Foley, early in his administration, wrote to the attorney-general on this subject:

*"Attorney-general, Topeka, Kansas:*                  "2-14-1919.

"DEAR GENERAL—Would you be kind enough to write me what the salaries of the mayor and commissioners are of the first-class cities like Parsons, over twenty thousand population. There seems to be different opinions on this matter and I would thank you to give me your opinion."

The attorney-general replied:

*"Mr. P. T. Foley, Parsons, Kansas:*    "TOPEKA, February 18, 1919.

"DEAR SIR—Under the existing provisions of our statute in cities of the first class, with from 20,000 to 30,000 inhabitants, and a commission form of government, the mayor shall receive a salary of not to exceed $2,000 per year, and each commissioner not to exceed $600 per year. The only exception to this provision is in cities of the first class which became cities of the first class after February 20, 1911, the date of the amendment of the statute, and in no cities with a population of from 15,000 to 25,000 does the mayor receive any more than $800 per year, and the commissioners $600 per year. Trusting this answers your inquiry satisfactorily, we are    Yours very truly,

"RICHARD J. HOPKINS, *Attorney-general.*"

In May, 1919, the judge of the local judicial district, also, unofficially but obligingly gave Mr. Foley the benefit of his opinion touching the salary question, saying among other matters—

"MY DEAR PETE—I received your letter this evening, and having a little spare time I have looked at the statute governing the payment of compensation to mayors and commissioners in cities of the first class in Kansas. I also note that it is the craziest statute that I have examined for some time. But I also note that General Hopkins is correct in his interpretation of the law, but was not as explicit as he should have been in explaining the law to you. . . ."

(Then follows an extended discussion relating to salaries of mayors in first-class cities of different population, and dependent upon the times at which such cities attained to such class and such population.)

The city attorney testified in substance:

"I have had several conversations with Mr. Foley in reference to his salary in January and February. Mr. Foley said he thought he was entitled to $1,800. I told him the statute only authorized him to receive not to exceed $1,800. I told him I had never been asked to construe the legality of the ordinance and told him he would not draw more than the ordinance provided. . . . He should not in my judgment draw more than $1,600 under any condition. So he said all right I will not draw the $1,800 but will take your judgment in place of the other men I have been talking to."

This record does not show when Parsons became a city of the first class, nor what was its population when the ordinance was passed. So far as pertains to the fixing of the mayor's salary, no infirmity in the ordinance is readily discernible. The words at the conclusion of the ordinance, providing that it should take effect and be in force "after its ratification by the Kansas Legislature," may perhaps be disregarded as surplusage. The sanction of the legislature to the fixing of the mayor's salary had already been enacted. But it is not necessary now to analyze and determine this extremely subtle point. Here our only concern is whether the mayor willfully misconducted himself in office or willfully neglected to perform any duty enjoined upon him by law. On this last charge the conduct of the mayor is subject to no just criticism.

Having assiduously labored through the abstracts and transscript, and having carefully examined the briefs, we have no hesitancy in sustaining the findings of fact made by the commissioner. We adopt them as our own. The charges against the defendants are not sustained, and defendants are entitled to judgment.

It is so ordered.