No. 43,770

THE STATE OF KANSAS, ex rel. WILLIAM M. FERGUSON, Attorney General, and ROBERT M. BROWN, County Attorney of Shawnee County, Kansas, *Appellant,* v. VERNON L. ROBINSON, Sheriff of Shawnee County, Kansas, *Appellee.*

(394 P. 2d 48)

Opinion filed July 14, 1964.

*J. Richard Foth,* Assistant Attorney General, of Topeka, argued the cause, and *William M. Ferguson,* Attorney General, and *Robert M. Brown,* County Attorney, both of Topeka, were with him on the briefs for the appellant.

*Charles Rooney, Sr.,* of Topeka, argued the cause, and *Charles Rooney, Jr.,* and *James R. Ward,* both of Topeka, were with him on the brief for the appellee.

The opinion of the court was delivered by

FONTRON, J.: This action in quo warranto was brought by The State of Kansas to oust the respondent, Vernon L. Robinson, Shawnee County sheriff, from his office. The trial court denied the relief sought in the petition and entered judgment in favor of the sheriff. After the state's motion for a new trial was overruled, this appeal was taken.

It is the state's position, as set forth in its petition, that Sheriff

Robinson was guilty of willful misconduct and willful neglect in performing the duties of his office by permitting one of his prisoners, Ray Armstrong, to go at large in violation of G. S. 1949, 21-740; that on April 8, 1963, Armstrong, who had been convicted by a jury of gambling and liquor offenses and who pleaded guilty to other like charges, had been sentenced and committed to the county jail for ninety days; that notwithstanding the commitment, Robinson agreed to let Armstrong spend his nights at home and issued orders to such effect to his deputies; that Armstrong was permitted to stay at home overnight and to return as he chose, which was usually after 7:00 a. m., the next day; that on more than one occasion Robinson himself took Armstrong home and left him unattended, and also directed one of his deputies to do the same; that on numerous occasions deputy sheriffs transported Armstrong to his home and left him there unattended; and that Robinson took Armstrong to Robinson's personal residence where Armstrong was left unattended and helped with carpentry work being done on Robinson's house.

In his answer, the respondent, in substance, denied any willful misconduct or willful neglect of duty; denied certain specific acts which were charged; denied, in essence, that Armstrong was permitted to go at large in violation of 21-740, *supra;* alleged that the law does not require a sheriff to keep a prisoner locked within a jail, but rather to restrain and prevent his escape; alleged that he could not be ousted until convicted of 21-740, *supra;* and alleged that he, as sheriff, had only done what was customary in Shawnee County and in Kansas generally.

Stated as briefly as possible, the state's evidence, as shown in the record before us, discloses that Armstrong was committed to jail April 8, 1963, after having been convicted of and pleading guilty to charges of violating gambling and liquor laws; that about a week thereafter he inquired of the sheriff if he might go home nights because of domestic troubles and was told that arrangements might be made; that from April 16 to April 24, 1963, inclusive, Armstrong was seen by investigators either returning to jail about 7:00 a. m., usually in a station wagon driven by his wife, or leaving jail in the evening with his wife or arriving at, entering or leaving his home at 700 Fillmore Street; that sometimes he would stay at home all night and other times he would return later in the evening; that sometimes he would be taken home by deputy sheriffs but on two occasions the

sheriff himself took him home; that on more than one occasion the sheriff instructed his deputies to take Armstrong home; that on at least two occasions Armstrong came into jail about 2:00 or 3:00 a. m., with liquor on his breath; that Armstrong was dressed in street clothes while gone from jail and either all or most of the time while in jail; that trusties were locked up at night and customarily wore coveralls; that a couple of times Robinson took Armstrong to his, Robinson's, residence, once stopping for some lumber, and on both occasions Robinson left Armstrong alone with a carpenter in the basement, where Armstrong would hand tools or boards to the carpenter, if they were needed; that in November, 1962, Robinson was seen to walk up to the bar of a club operated by Armstrong where a slot machine was in plain view, and was there served a drink and conversed with Armstrong; and that on April 19, 1963, Robinson was told by one of his own investigators that the Attorney General's office was investigating a prisoner who was in jail but out running a night club at night.

The respondent Robinson made no pretense of contradicting the state's evidence with the following exceptions: 1. He denied making arrangements with anybody else to take Armstrong home, except that he twice sent Armstrong home with deputies to shower and change clothes; (2) he denied knowing that Armstrong was going home nearly every night; (3) he testified he never drank on duty and did not see a slot machine at Armstrong's place in November; and (4) he denied leaving Armstrong alone at the sheriff's residence for a full afternoon.

In testifying on his own behalf, Robinson admitted that he twice took Armstrong home in the evening and left him with the understanding that Armstrong would be back before 7:00 o'clock in the morning; he admitted twice sending Armstrong home with deputies to shower and change clothes and admitted that he did not know whether Armstrong had returned the same evening; and he admitted that on two occasions he took Armstrong to his own, Robinson's, home where Armstrong helped unload a pickup and stuff, and where Armstrong was left alone with a carpenter for part of one afternoon. Much of the sheriff's testimony was concerned with defining his concept of "custody," his feelings of trust in Armstrong, his denial of improper motivation and what he understood was the custom in Shawnee County with respect to trusties.

After completion of the trial, which consumed two days, the

court filed a comprehensive and well prepared memorandum opinion in which, after first stating that the facts were basically undisputed, the court reviewed the evidence, discussed the principles of law involved, canvassed legal authorities and concluded, after pointing out certain factors which it considered significant, that while the sheriff's conduct should expressly be disapproved as a breach of good judgment, it did not arise to the gravity of willful misconduct with an evil motive and that judgment should therefore be entered in favor of the respondent.

The basic issue confronting us is whether the undisputed and uncontradicted evidence constitutes grounds for ouster under the law as it exists in this state.

This action was initiated by the state under the provisions of G. S. 1949, 60-1601 through 1624. Specifically, the grounds for forfeiture of office are defined in section 60-1609, as follows:

"Every person holding any office of trust or profit, under and by virtue of any of the laws of the state of Kansas, either state, district, county, township or city office, who shall willfully misconduct himself in office, or who shall willfully neglect to perform any duty enjoined upon such officer by any of the laws of the state of Kansas, or who shall in any public place within or without the state be in a state of intoxication produced by strong drink voluntarily taken, or who shall engage in any form of gambling, or who shall commit any act constituting a violation of any penal statute involving moral turpitude, shall forfeit his office and shall be ousted from such office in the manner hereinafter provided."

The duties and responsibilities of a sheriff concerning prisoners committed to his charge are clearly prescribed by statute. G. S. 1949, 19-811, provides that the sheriff shall have charge and custody of the jail of his county and all prisoners therein. G. S. 1949, 62-1517 and 1518 outline his obligations in connection with such prisoners as follows:

"Whenever a sentence of imprisonment in a county jail shall be pronounced upon any person convicted of any offense, the clerk of the court shall as soon as may be make out and deliver to the sheriff of the county a transcript of the entry of such conviction and of the sentence thereupon, duly certified by such clerk, which shall be sufficient authority to such sheriff to execute such sentence, and *he shall execute the same accordingly.*" ( 62-1517.) (Emphasis supplied.)

"Where any convict shall be sentenced to any punishment the clerk of the court in which sentence was passed shall forthwith deliver a certified copy thereof to the sheriff of the county, who shall without delay, either in person or by a general or usual deputy, *cause such convict to receive the punishment to which he was sentenced.*" ( 62-1518.) (Emphasis supplied.)

The foregoing statutes are supplemented by a section of the penal code, G. S. 1949, 21-740, which provides:

"If any officer or his underofficer or deputy, or any lessee, keeper, agent or guard of any place of confinement, *having the lawful custody of any prisoner for any cause whatever,* shall voluntarily suffer or permit or connive at the escape of such prisoner from his custody, *or permit him to go at large,* he shall on conviction be punished in the same manner as if he were convicted of aiding or assisting such prisoner to escape." (Emphasis supplied.)

Thus, the provisions of our statutes permit no doubt that the law enjoins upon one who has assumed the heavy responsibilities of a sheriff, the solemn and inescapable obligation of confining all prisoners who are committed to his care in strict accordance with the commands of the commitments under which they are received. It is the bounden duty of such an officer to execute with fidelity the sentences of the prisoners committed to his keeping.

It was held long ago that where a court has pronounced sentence, ". . . it is the duty of the sheriff to immediately proceed to carry the sentence into effect. . . ." (*In re Strickler, Petitioner,* 51 Kan. 700, 702, 33 Pac. 620.) In *Jackson v. State,* 52 Kan. 249, 34 Pac. 744, this very same rule was applied, and we said:

". . . it is the duty of the sheriff to take prisoners into his custody and keep them. If he has no convenient place for doing so, he must use one that is not so convenient. . . ." (p. 252.)

In *Whalen v. Cristell,* 161 Kan. 747, 173 P. 2d 252, this court held:

"The duty of an officer in executing the mandate of a judicial order in the nature of a commitment is purely ministerial and his power with respect thereto is limited and restricted to compliance with its terms." (Syl. ¶ 4.)

We have no hesitancy in saying that where a sheriff permits a prisoner to leave the confines of his jail at night, and to remain away therefrom, entirely without supervision or control, until the following day, he has been derelict in his duties and culpable in his conduct. And such a conclusion, we believe, is unavoidable in the present case in view of the undisputed evidence in the record.

The evidence before us is uncontradicted that Armstrong asked Sheriff Robinson if he might go home at night and was told by the sheriff, "I will see about it." The evidence is uncontradicted that the sheriff twice took Armstrong home at night with the understanding that he would be back before 7:00 o'clock in the morning. The evidence is uncontradicted that Robinson twice sent Armstrong home with deputies to shower and change clothes and did

not know whether they brought him back or not. The evidence is uncontradicted that on two occasions Robinson took Armstrong to the sheriff's own residence where he helped unload a pickup and where he was left alone at least part of one afternoon.

Each of the foregoing incidents was established by admissions of the sheriff himself, and most of it by outside evidence as well. Each incident evidences a positive and voluntary act on the part of the sheriff which conflicts with his statutory duty to execute the court's order and to carry out the punishment imposed.

Each time the prisoner, Armstrong, was left unattended, he was "at large" within the meaning of 21-740, *supra*, as we comprehend the meaning and import of that penal statute. Thus, the criminal code, itself, was violated. While there are few authorities which have defined the phrase, "to go at large," it is logical to assume it was intended by the legislature to mean "to leave" or "to be free from" the restraint of imprisonment. Such, in our judgment, is the sense of the phraseology in common, everyday parlance. (See *Saxton v. Sanborn County*, 76 S. D. 169, 74 N. W. 2d 843; *Hegwood v. State*, 213 Miss. 693, 57 S. 2d 500.)

Taken together, the several episodes admitted by Sheriff Robinson establish, by themselves, a course of behavior on his part which we believe may be characterized only as neglect of official duty and misconduct in office. Nor can we concur in the trial court's conclusion that such conceded deportment was innocent or that it fell short of the gravity of willful misconduct. The several acts appear not to have been done by accident or by inadvertence, but evidence every indication of having been done deliberately and intentionally. The conduct was, moreover, unlawful, for it was in violation of 21-740, *supra*, which declares it a crime for one in Robinson's position knowingly to permit a prisoner to go at large.

In *State v. Bush*, 45 Kan. 138, 25 Pac. 614, it was held that where an act is made criminal by statute without specific reference to intent, the only criminal intent involved in the commission of the crime is the intent to commit the act prohibited, and an express allegation of intent is not required, but the intent will be presumed. The court, in its opinion, said:

". . . Mr. Bishop, in his work on Criminal Procedure, (volume I, § 521,) . . .:

. . . . . . . . . . . . . .

"And in note 2 to the same section, he uses the following language:

" 'Where the act is in itself unlawful, an evil intent will be presumed, and

need not be averred; and, if averred, is a mere formal allegation which need not be proved by extrinsic evidence.'" (pp. 141, 142.)

The respondent cites *State, ex rel., v. Foley,* 107 Kan. 608, 193 Pac. 361, in which it was held:

"In quo warranto, where forfeiture of a public office is demanded by the state on charges of willful misconduct in office or willful neglect of official duty, the paramount consideration in scrutinizing the acts of the defendant officer is whether they bear the distinguishing characteristics of genuine good faith, not whether those acts are technically free from error when viewed under rigid and critical scrutiny." (Syl. ¶ 2.)

From this, and other cases of like import (See *State v. Trinkle,* 70 Kan. 396, 78 Pac. 854; *State, ex rel., v. Wilson,* 108 Kan. 641, 196 Pac 758), it is argued that the evidence in the case at bar fails to establish grounds for ouster, in that the element of wrongful motivation, or willfulness, is lacking. We have already pointed out that intent is presumed where, as here, the violation of a penal statute not requiring specific intent, is involved. However, let us examine the record to ascertain what it actually does reflect as to good faith and righteous intent.

It is not disputed that Armstrong, a former acquaintance, was treated differently than other prisoners. The evidence is undisputed that other trusties were locked up at night, while Armstrong was not. The evidence is undisputed that other trusties customarily wore jail garb, while Armstrong customarily did not, and the respondent's explanation that he had no coveralls to fit his privileged prisoner has a hollow ring, for the record shows no attempt to supply the alleged deficiency. No other prisoners were taken home by deputy sheriffs, at the sheriff's instructions, "to shower and change clothes." The sheriff's attempted justification that this permission was granted because Armstrong wanted some clean clothes, had been working all day and was dirty, seems frivolous and whimsical. What prisoner would not welcome the same privilege for the same reasons? The evidence is undisputed that Sheriff Robinson has never at any time permitted any prisoner, except Armstrong, to spend his nights at home; nor had any prisoner been permitted to go away from jail, with the single exception of one lone colored trusty who was allowed to go home Easter Sunday morning to go to church.

Furthermore, and we deem this of significance, there is no denial that respondent was warned by one of his own men on April 19 that an investigation was under way regarding a trusty going out

somewhere and running a joint. This, at least, should have given the sheriff cause to ponder the propriety of his conduct as it related to Armstrong and, if actually he did not know that Armstrong was going home *every* night, then to begin an immediate investigation into the activities of his subordinates. The record, however, is bare of evidence to indicate that Robinson heeded the warning in any respect. To the contrary, Armstrong's home visits continued as before, and even included a family jaunt over the weekend of April 20.

The undisputed evidence, as detailed above, together with the strong inference, justified by other undisputed testimony, that Armstrong helped work on respondent's house, goes far to negative his claim of good faith. We are not convinced that the sheriff's activities, when closely scrutinized, bear the distinguishing characteristics of genuine good faith to which reference was made in *State, ex rel., v. Foley,* supra.

So far as its own specific facts are concerned, the instant action is one of first impression in this state. However, cases involving somewhat analogous situations have, on divers occasions, been before this court. A few will suffice to illustrate the tenor and direction of our holdings. In *State, ex rel., v. Martin,* 87 Kan. 817, 126 Pac. 1080, it was held that failure of a sheriff to notify the county attorney of violations of the prohibitory law known to him was grounds for ouster, even though the county attorney may have failed to follow up information previously given him, or may have possessed substantially as much knowledge as did the sheriff. In the opinion, it was said:

"Under the statute (Laws 1911, ch. 237, § 1) the willful neglect of an officer to perform a duty enjoined by law works a forfeiture of his office. The defendant was familiar with the statute defining his duties with reference to the enforcement of the prohibitory law, and his failure to observe it must be regarded as willful within the meaning of the act. . . ." (p. 824.)

In *State, ex rel., v. Baird,* 117 Kan. 549, 231 Pac. 1021, the continued failure of a county attorney to file actions to recover on forfeited bonds, which actions, under the law, it was his duty to bring, was held to constitute willful neglect requiring his removal from office. On page 556 of the opinion, the court said:

". . . These duties are imposed by law upon the county attorney and while he might delegate them to some deputy in his office, for it was not possible for him personally to perform all the duties pertaining to his office, he could not neglect them entirely. To say that he could do so with

impunity would destroy the machinery which the statutes establish for the effective prosecution of crime."

It was held in *State, ex rel., v. Jackson,* 139 Kan. 744, 33 P. 2d 118, that mistreatment of a prisoner constituted willful misconduct in office. In *Farmer v. Rutherford,* 136 Kan. 298, 15 P. 2d 474, this court said:

". . . An act done by a public officer in direct violation of a statute regulating his official duties is official misconduct within the terms of his bond. . . ." (p. 305.)

The case of *State, ex rel., v. Fishback,* 102 Kan. 178, 171 Pac. 348, was one to remove the clerk of the city court of Wichita for failure to pay to the county treasurer moneys due the county. The defendant alleged his failure was due to a misunderstanding of the law and it was held that ". . . Confusion arising out of a misunderstanding of the operation of these statutes is not an excuse for failure to pay the amount that was due the county . . ." (p. 181.). The analogy between this case and the present action is patent.

In *State, ex rel., v. McKnaught,* 152 Kan. 689, 107 P. 2d 693, the court held that where the Topeka police chief was in a hotel room during a convention and observed others drinking liquor, and took no action in regard thereto, he was guilty of misconduct requiring a judgment of ouster, even though he drank no liquor himself and even though the court-appointed commissioner found no wrongful motive on the chief's part. In discussing the case, the court observed that it was not for the defendant to decide when the law should be enforced and when it should not. We believe this principle applicable to the instant situation. It was not for the respondent sheriff to determine whether prisoners should spend their nights at home or in jail or which prisoners should be favored with such unwarranted privileges, and which should not.

In *State, ex rel., v. Duncan,* 134 Kan. 85, 4 P. 2d 443, the court entered a judgment of ouster against two county commissioners for having made changes in and additions to the enumeration books. On the question of good faith, the court said:

". . . good faith in the performance of their official duty would have required them (the county commissioners) to have examined and inquired into the enumeration, together with the manner in which it was taken, with the closest scrutiny. Good faith would dictate, when confronted with this problem, that they counsel the proper legal authority as to their rights and responsibilities in the premises. . . ." (pp. 95, 96.)

In this particular aspect the case closely parallels the present one, for Robinson sought no advice from legal authorities except, allegedly, from a judge he could not name at times he could not specify.

We believe that the respondent's conduct is of the character proscribed by 60-1609, *supra*. In *State v. Kennedy*, 82 Kan. 373, 108 Pac. 837, this court said:

". . . The statute must be interpreted in the light of the mischief it was intended to remedy. (*The State v. Bush*, 47 Kan. 201.) The purpose was to prevent persons from continuing to hold office whose inattention to duty, either because of its habitualness or its gravity, endangers the public welfare. Therefore the neglect contemplated must disclose either willfulness or indifference to duty so persistent or in affairs of such importance that the safety of the public interests is threatened. . . ." (p. 386.)

Sheriff Robinson's conduct comes squarely within the category thus described. It is difficult, indeed, to envision a practice fraught with graver danger to the public peace and to the personal security of individual citizens than to allow convicted criminals to be at large while serving their sentences. Nor can we conceive of any custom which would be more destructive to discipline within a jail or more damaging to the morale and decorum of its population than for the sheriff to play favorites among the prisoners in the brazen fashion employed by this respondent. The neglect shown by the undisputed evidence is clearly of a nature which would pose a threat to the public welfare. It is intolerable in our form of society.

Our conclusion finds support in cases from other jurisdictions in which the same question has arisen. In our sister state of Oklahoma, which has a statute similar to ours, it was held in *State v. Brown*, 8 Okl. Cr. 40, 126 Pac. 245, that:

"The law provides county jails as the places of confinement of prisoners before trial, and sheriffs have no right to keep them anywhere else, or to allow them to be at liberty, except on order of a court of competent jurisdiction. Sheriffs have no right to have pets or favorites, or extend any liberties or privileges to one prisoner which the law does not extend to all prisoners. It is the duty of trial judges and county attorneys in this state to see that the law in this respect is obeyed." (Syl. ¶ 3 [c].)

See also *McCasland v. Board of Com'rs of Adair County*, 126 Okl. 103, 258 Pac. 750, where a sheriff was removed from office for permitting prisoners to run at large and where the court said:

"We think, . . . that it was the business and the duty of the sheriff

to know that prisoners committed to his keeping were during their commitment retained and imprisoned in the county jail. . . ." (p. 106.)

In *State of Iowa v. Welsh,* 109 Iowa 19, 79 N. W. 369, the court, in reversing a holding for the defendant, said:

". . . But, apart from this, the evidence showed that the defendant left the prisoner without any one in charge of him. He whom the law had condemned to a term of years in the penitentiary was allowed his liberty for thirty hours. It was the sheriff's duty to keep him in custody continually, and in awarding him the freedom of a city, if willfully done, he was guilty of willful neglect of duty." (p. 25.)

In *State v. Cyrus,* 83 W. Va. 30, 97 S. E. 412, mandamus proceedings were brought to compel the defendant sheriff to carry into effect a sentence of imprisonment and, in granting the writ, the court stated:

". . . The sheriff must keep the prisoner confined in the jail, and grant him no privilege or indulgence inconsistent with his status as a prisoner, and permit no relaxation of the confinement of his person, not only that he may at all times be within the control of the sheriff, but also that the imprisonment may be actual, irksome and a service of discomfort, so far as confinement in the jail may produce such results." (pp. 30, 31.)

Further elaboration upon the subject is neither required nor advisable. In our considered judgment, the undisputed evidence establishes willful misconduct and willful neglect of duty on the part of respondent, and the trial court's conclusions to the contrary cannot be sustained. Under these circumstances, it becomes our duty to order the proper judgment. (*Devlin v. City of Pleasanton,* 130 Kan. 766, 288 Pac. 595; *Byer v. Byer,* 180 Kan. 258, 303 P. 2d 137.)

The judgment of the court below is reversed with directions to enter judgment against the respondent, ousting him from office.