No. 110,835

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DAVID SCOTT MORRISON, WARD 5 COUNCILMAN, CITY OF PRAIRIE VILLAGE,
JOHNSON COUNTY, KANSAS,
*Appellant*.

SYLLABUS BY THE COURT

1.

There is no right to a jury in ouster proceedings and use of an advisory jury is within the discretion of the district court. Findings of an advisory jury have no binding effect on a district court and the court remains obliged to determine the disputed facts, reaching its own independent conclusions. On review, the appellate court will consider only the findings of fact as determined by the district court itself.

2.

When an issue involves a legal determination based on undisputed facts, our review must, considering those facts, be made without deference to the district court's legal conclusion.

3.

Ouster of a public official pursuant to K.S.A. 60-1205(1) and (2) is an extraordinary judicial remedy that should only be invoked where the evidence is clear and convincing and the misdeeds flagrant.

1

4.

Judicial ouster pursuant to K.S.A. 60-1205(1) and (2) is available only in circumstances that show a corrupt purpose or an evil design by virtue of either (1) a persistent and habitual disregard for the law or for the official's public duty or (2) acts so egregious that they pose a grave threat either to public safety or to the public fisc.

5.

Our longstanding view of judicial ouster as a drastic remedy, available only on a showing of serious wrongdoing, is deeply rooted in judicial respect for the separation of powers and judicial restraint in the face of political questions.

6.

On the undisputed facts of this case, the actions of the public official in question did not demonstrate, pursuant to K.S.A. 60-1205(1) and (2), either willful misconduct or a willful neglect to perform a duty as those terms have been interpreted. Therefore, judicial ouster was not proper.

Appeal from Johnson District Court; DAVID W. HAUBER, judge. Opinion filed October 10, 2014. Reversed and remanded with directions.

*Rex A. Sharp* and *Barbara C. Frankland*, of Gunderson Sharp, LLP, of Prairie Village, *J. Brett Milbourn*, of Walters Bender Strohbehn & Vaughan, PC of Kansas City, Missouri, and *Thomas J. Bath, Jr.*, of Bath & Edmonds, PA, of Overland Park, for appellant.

*Steven J. Obermeier*, assistant district attorney, and *Stephen M. Howe,* district attorney, for appellee.

Before LEBEN, P.J., PIERRON and STEGALL, JJ.

STEGALL, J.:  After a full trial, David Scott Morrison was ousted from public office. Because we find that the undisputed facts of this case do not, as a matter of law, satisfy the

2

criteria for judicial ouster contained in K.S.A. 60-1205, we reverse the decision of the lower court and remand with directions that judgment be entered in Morrison's favor, thus reinstating him to his public office.

FACTS

Morrison was elected to the Prairie Village City Council in 2008 and re-elected in 2012. Kelley Malone was Morrison's long-time friend and a former coworker. In 2011, Malone began to have substance abuse problems. Eventually, Malone lost his job and became homeless. At this point, Malone called Morrison seeking help, as he believed he had nowhere else to turn. Morrison arranged for Malone to stay in a hotel for a week, bought him clothes, and set up a job interview for him. With employment, Malone's circumstances improved and he was able to purchase a home.

Unfortunately, the following year Malone relapsed. He again lost his home and feared for his life because he came to believe that a "hit" had been taken out against him. On Saturday, October 27, 2012, Malone again sought Morrison's help. Morrison called his church seeking both advice and sanctuary for Malone. A pastor informed him that the church could not accommodate Malone and, further, that putting Malone in a hotel was ill-advised. Morrison then called a Prairie Village dispatcher, Dawn Johnson, to inquire into public resources available to assist the homeless. Johnson told Morrison that the usual practice was for a police officer to take the person to the City Union Mission in Kansas City, Missouri. Morrison arranged a spot for Malone at the City Union Mission, however, Malone refused to go as he did not believe it was a safe location. Morrison did not consider his own home a viable place for Malone to stay as Morrison lived with his elderly parents. Morrison's mother's immune system was so compromised that Morrison himself would check into a hotel when he contracted an illness or cold so as not to expose his mother to illness. Morrison feared a stranger in his home would endanger his mother's fragile health.

At a loss, Morrison made the fateful decision to house Malone in city hall for a few days. The Prairie Village City Hall and police station are located in the same complex, separated by a

3

long corridor. Access to city hall after normal business hours requires entering the police station, walking past the dispatch window, and passing through a locked door opened using a four digit security code. Each city councilman had a unique security code, though there were no policies or restrictions as to how those security codes could be used. The security code permitted access to the employee lounge, a weight room, and a locker room but not to any work spaces or other areas of city hall.

That Saturday evening, Morrison brought Malone to city hall around 6 p.m. Morrison walked to the dispatch window where Johnson was working and told her that he and Malone were there for a neighborhood meeting. Morrison also told Johnson not to be alarmed if she saw Malone on the surveillance cameras as he was with Morrison. Johnson was suspicious of Morrison's explanation and sent the following message to a Prairie Village police officer:

> "Ok, you know the homeless guy I told you David Morrison was calling about? Well he just took him over to city hall. Telling me 'they' were having a meeting with the rest of the neighborhood . . . . Surely he wouldn't let that guy stay the night over there would he? I don't know of any meeting . . . not that that matters."

At some point, Morrison and Malone left city hall to get dinner, returning at about 9 p.m. Pamela Huskey was working at the dispatch window when they returned and Morrison told her that he and Malone would be working in city hall that night. Twenty minutes later, Morrison left while Malone stayed to spend the night. Before leaving, Morrison gave Malone his security code after realizing that without it, Malone would not have restroom access.

The following morning, the janitor saw Malone in the city hall employee lounge. Just after noon, Morrison picked Malone up and the two attended a football game that evening. They returned to city hall just after midnight on Monday morning, October 29, 2012. Morrison told the dispatcher on duty, Cory Parker, that he and Malone were going to do paperwork in city hall. Morrison left a few minutes later. Malone again spent the night in city hall, leaving mid-morning on Monday and not returning for the rest of that day. He spent Monday night sleeping in the back of another friend's car.

4

That same day, Morrison called Police Chief Wes Jordan to discuss Malone's situation. Morrison described Malone's current drug addiction and told Chief Jordan that Malone had information about drug transactions and human trafficking operations. Chief Jordan instructed Morrison to have Malone contact him so he could meet with the Special Investigations Unit, a police unit primarily focusing on drug crimes. Neither Malone nor Morrison contacted Chief Jordan to arrange a meeting time.

The following evening, Tuesday, October 30, 2012, Malone again called Morrison and asked to stay the night at city hall. Morrison told Malone that he did not think it would be a good idea, however, Malone ignored Morrison's plea. Malone arrived at city hall just after midnight on Wednesday, October 31, 2012. Malone told Huskey, who was again working the dispatch window, that he and Morrison were going to be working again in city hall and that Morrison would be arriving soon. Malone then entered city hall. Morrison never arrived.

That morning, multiple city hall employees encountered Malone. Bettina Jamerson, the court administrator, encountered Malone at 7:30 a.m. as he was sitting in the employee break room. She reported Malone's presence to Officer Kyle Shipps. Officer Shipps confronted Malone and asked him why he was in the employee break room. Malone replied that he was there to meet with Morrison and Chief Jordan. Penny Mann, another employee, saw Malone in the break room around 8 that morning. She asked if she could help Malone, and he told her that he was waiting for Morrison to arrive with an attorney. Likewise, employee Sheila Hopkins saw Malone around 8:30 that morning when she entered the break room and saw Malone talking on a cell phone. Unsure of whether he was supposed to be there, Hopkins asked Malone if there was anything she could do for him. Malone responded by giving Hopkins "a really dirty look." Malone noisily gathered his things, left the break room, and went to the locker room.

When Chief Jordan arrived at work, Officer Shipps told him that Malone was waiting to meet with him. Chief Jordan found Malone in the locker room and escorted him back to the police station. Malone told Chief Jordan that he was dropped off by Morrison around 7 a.m. that morning. Chief Jordan attempted to call Morrison but was unable to reach him. Chief Jordan

5

deactivated Morrison's security code and initiated an investigation to determine when Malone had actually been in city hall.

Following the investigation, the Prairie Village City Council voted to oust Morrison from his position. A trial with an advisory jury was had, and the district court entered an order of ouster. Morrison now appeals.

ANALYSIS

On appeal, Morrison asserts three claims of error: (1) The district court misapplied K.S.A. 60-1205 when it found that the undisputed facts of this case justified Morrison's ouster; (2) jury instruction and verdict form errors; and (3) that ouster requires a violation of state law which was not found in this case. Because we find in Morrison's favor on the first claim of error, we need not reach his final two claims.

*The District Court Decision*

We first note in passing that the district court chose to utilize an advisory jury in this matter. There is no right to a jury in ouster proceedings and use of an advisory jury is within the discretion of the district court. *State ex rel. Stovall v. Meneley*, 271 Kan. 355, 381, 22 P.3d 124 (2001). Findings of an advisory jury have no binding effect on a trial court and the court remains obliged to determine the disputed facts, reaching its own independent conclusions. See *In re Roberts' Estate*, 192 Kan. 91, 99, 386 P.2d 301 (1963); *Grannell v. Wakefield*, 172 Kan. 685, 691, 242 P.2d 1075 (1952). Therefore, we will consider only the findings of fact as found by the district court itself.

The facts as set forth above were found by the district court, are not contested by the parties, and we accept them as true on appeal. The district court's ruling includes a thorough discussion of these facts and their implications. At the outset, the court found that the "undisputed evidence reflects a series of events that can only be described as reflecting breathtakingly bad judgment by Mr. Morrison." This bad judgment was exacerbated by

6

Morrison's decision to mislead city officials and apparently the district court as well. Morrison initially claimed that the cover story he used to justify Malone's presence in city hall was not dishonest but merely a "miscommunication." The district court found this explanation "not credible," further finding:

> "That Mr. Morrison had lied about the reason for Mr. Malone's presence and then sought to spin this same conversation in court, is particularly disturbing. . . . This was a significant line of testimony because the intent to lie and misrepresent is reflective of the fact that Mr. Morrison knew that what he was doing was wrong."

The district court was likewise concerned about Malone himself, describing him as "a gaunt version of himself" who "sat hunched over" with his "nose dripping throughout his testimony." This led the court to conclude:

> "Mr. Morrison chose to ignore the potential risks and security breach posed by Mr. Malone, who, in many respects, he did not know. He knew that he had been addicted to meth although he claimed to be 'clean' for a week. . . .
> ". . . Mr. Malone posed an unnecessary risk; he posed a health and security risk."

It was this potential risk that the district court focused on throughout its decision. The court concluded that Morrison's actions exposed city employees to Malone without giving them "the choice to know whether Mr. Malone represented a threat to their health, much less whether his story of being a target for drug gangs could expose them to harm while Mr. Malone was coming or going from City Hall."

The district court summarized Morrison's conduct as follows:

> "[Morrison] used city property for his own benefit and to assuage his own views of what humanitarian gestures should be. Instead of being up front about it and risking question, he sneaked Mr. Malone in with a cover story that was a lie.

. . . .

"The foregoing suggests that Mr. Morrison was willing to compromise his own integrity, the integrity of the City, and the security of others because it appealed to his own need to be regarded as a benefactor to Mr. Malone . . . . He used city property for his own benefit, to extend a favor to another, and misled people along the way."

Based on these undisputed facts the district court concluded as a matter of law that Morrison had violated two provisions of the Prairie Village City Code of Ethics. That code precludes a council member from granting "any improper favor, service or thing of value" and from permitting the use of city property "for personal convenience . . . except when such services are available to the public generally." Prairie Village City Code of Ethics 1-212(e)(6)(b) and 1-212(g). The district court further concluded that these acts demonstrated both that Morrison had "willfully engage[d] in misconduct while in office" and had "willfully neglect[ed] to perform [a] duty enjoined upon [him] by law" in violation of K.S.A. 60-1205(1) and (2), thus making ouster the proper judicial remedy.

In reaching this conclusion, the district court wrote that even though Malone "did no harm while at City Hall" and even though the result might have been different if "the person Mr. Morrison sought to help was an abused spouse seeking sanctuary," ouster was the appropriate sanction under the undisputed facts because "the councilman owed citizens a fiduciary obligation to protect city property, staff and citizens, all of which could have been jeopardized by a thoughtless risk to which Mr. Morrison would not even subject his own family."

*A Review of Ouster Law in Kansas*

Ouster of public officials via quo warranto proceedings is controlled by statute at K.S.A. 60-1205, which provides:

"Every person holding any office of trust or profit, under and by virtue of any of the laws of the state of Kansas, either state, district, county, township or

8

city office, except those subject to removal from office only by impeachment, who shall (1) willfully engage in misconduct while in office, (2) willfully neglect to perform any duty enjoined upon such person by law, (3) demonstrate mental impairment such that the person lacks the capacity to manage the office held, or (4) who shall commit any act constituting a violation of any penal statute involving moral turpitude, shall forfeit such person's office and shall be ousted from such office in the manner hereinafter provided."

Whether the district court correctly applied K.S.A. 60-1205 to the undisputed facts in this case raises a question of statutory interpretation over which we exercise unlimited review. *Poteet v. Kansas Dept. of Revenue*, 43 Kan. App. 2d 412, 415, 233 P.3d 286 (2010) ("When an issue involves a legal determination based upon undisputed facts, our review must consider those facts and be made without deference to the district court's conclusion.").

When interpreting Kansas ouster statutes, our Supreme Court has recognized that ouster is an extraordinary judicial remedy, "a drastic action . . . that should be invoked only where the evidence is clear and convincing and the misdeeds flagrant." *State ex rel. Tomasic v. Cahill*, 222 Kan. 570, 572, 567 P.2d 1329 (1977).

"It is not every oversight or omission within the strict letter of the law which will entail forfeiture of office. The purpose of the statute is to prevent persons from continuing to hold office whose inattention to duty, either because of its habitualness or its gravity, endangers the public welfare; and the neglect contemplated must disclose either willfulness or indifference to duty so persistent or in affairs of such importance that the safety of the public interest is threatened." *State ex rel. Hopkins v. Corwine*, 113 Kan. 192, 196, 213 P. 658 (1923) (citing *State v. Kennedy*, 82 Kan. 373, Syl. ¶ 10, 108 P. 837 [1910]).

Ouster is only appropriate in circumstances demonstrating a "willful violation of official duty prompted by a bad or corrupt purpose, and without any reasonable grounds to believe the action is lawful. Mere departure from the letter of the law will not warrant a judgment of ouster,

unless it is prompted by an evil design." *State*, *ex rel.*, *v. Duncan*, 134 Kan. 85, 94-95, 4 P.2d 443 (1931), citing *The State v. Trinkle,* 70 Kan. 396, 78 P. 854 (1904), and *The State, ex rel., v. Foley*, 107 Kan. 608, 193 P. 361 (1920). Further, a simple error of judgment is not sufficient to satisfy the statute, only "unlawful acts prompted by a corrupt purpose and bad faith warrant a judgment of ouster." *Duncan*, 134 Kan. at 95.

Our review of prior judicial ousters of public officials in Kansas makes it clear that this remedy is available only in circumstances that show a corrupt purpose or an evil design by virtue of either (1) a persistent and habitual disregard for the law or for the official's public duty or (2) acts so egregious that they pose a grave threat either to public safety or to the public fisc. See, *e.g., The State ex rel., v. Baird*, 117 Kan. 549, 554, 231 P. 1021 (1925) (county attorney ousted for failing to ensure sentences of state liquor law violations actually served); *State, ex rel., v. Howard,* 123 Kan. 432, 432-33, 256 P. 172 (1927) (county commissioner ousted for intentionally inducing the commission to pay a new tractor price for a used tractor); *State, ex rel., v. Darnall,* 123 Kan. 643, 256 P. 974 (1927) (official ousted for knowingly padding travel reimbursement and using city funds to pay his personal automobile insurance premium, thereby defrauding the public fisc); *Duncan,* 134 Kan. 85 (county commissioner ousted for falsifying census books so his salary would not be decreased); *State, ex rel., v. Jackson,* 139 Kan. 744, 752, 33 P.2d 118 (1934) (sheriff ousted for failing to keep proper record of fees collected and habitually beating prisoners—"[n]othing is more destructive to good government than to have our laws constantly or habitually violated by officials whose duty it is to enforce them"); *State, ex rel., v. Harvey,* 148 Kan. 166, 172, 80 P.2d 1095 (1938) (district court clerk ousted for embezzlement and forgery); *State, ex rel., v. McKnaught,* 152 Kan. 689, 107 P.2d 693 (1940) (police chief ousted for refusing to enforce prohibition liquor laws); *State, ex rel., v. Robinson,* 193 Kan. 480, 489, 394 P.2d 48 (1964) (sheriff ousted for permitting a convicted prisoner to leave the jail unsupervised—"[i]t is difficult, indeed, to envision a practice fraught with graver danger to the public peace and to the personal security of individual citizens than to allow convicted criminals to be at large while serving their sentences"); *State, ex rel., v. Schroeder,* 199 Kan. 403, 430 P.2d 315 (1967) (county commissioner ousted for hiding his conflict of interest through an undisclosed trade name, wrongfully depleting the county treasury, and violating statutes by selling utility generators to the county at excessive prices); *State, ex rel., v. Cahill,* 222 Kan. 570,

10

576, 567 P.2d 1329 (1977) (Kansas City Board of Public Utilities members ousted for knowingly padding their expense accounts and forcing the Board to buy supplies from a Board member's sibling's business at higher prices than offered by previous vendor); *State ex rel. Miller v. Richardson,* 229 Kan. 234, 623 P.2d 1317 (1981) (county treasurer ousted for crediting employees with hours not worked in exchange for sexual favors).

*Application of Kansas Ouster Law to David Morrison*

David Morrison proved to be a clumsy benefactor. Worse, Morrison added casuistry to clumsiness when he fabricated a cover story to explain Malone's presence in city hall. But after considering the entire record and the underlying facts as determined by the district court, we are unable to find any indication that Morrison's actions arose out of an evil or corrupt motive; out of a habitual disregard for his public duty; out of a quest for selfish gain; or resulted in a serious threat to public safety.

As the district court acknowledged, Morrison was primarily—if not wholly—motivated by his sincerely held view of his humanitarian duty to his fellow man. There is no evidence that this incident is anything other than an isolated and singular occurrence. Morrison gained no financial benefit and his actions did not threaten the public fisc. The district court expressly noted that Malone's presence at city hall did no actual harm. The court justified its ouster order with its conclusion that Morrison had subjected city employees to a potential threat to their health and safety. To the contrary, however, we conclude that dripping noses and dirty looks are not the kinds of dangers to public safety that warrant judicial ouster. As such, we find that the district court erred in its application of K.S.A. 60-1205 to the facts of this case.

In its ruling, the district court noted a "superficial appeal" of allowing "the voters in Ward 5 to show their displeasure through either a recall election or at the next ballot box." We cannot so easily dismiss these available political remedies as preferable alternatives to a judicial ouster in a case such as this. Our courts' long history of considering judicial ouster a drastic remedy, available only on a showing of serious wrongdoing, is deeply rooted in judicial respect for the separation of powers and judicial restraint in the face of political questions. See, *e.g., Gannon v.*

11

*State*, 298 Kan. 1107, 1137, 1148, 319 P.3d 1196 (2014) ("'The nonjusticiability of a political question is primarily a function of the separation of powers'" and "[t]he presence of all political power in the people is one of the 'truths, which lie[s] at the foundation of all republican governments,'" quoting *Baker v. Carr*, 369 U.S. 186, 210, 82 S. Ct. 691, 7 L. Ed. 2d 663 [1962] and *Wright v. Noell*, 16 Kan. 601, 603 [1876].) It may very well be that the people of Ward 5 will determine that Morrison's actions merit a loss of public trust and, consequently, of his public office. This is not a case, however, where the need to protect the public's interest is so grave and immediate that judicial preemption of the political process is justified.

The district court's decision is reversed and we remand this matter with directions that judgment be entered in Morrison's favor, thus reinstating him to his public office.

Reversed and remanded with directions.