No. 30,001.

THE STATE OF KANSAS, ex rel. WILLIAM A. SMITH, Attorney-general, *Plaintiff,* v. WILL S. DUNCAN, *Defendant.*

No. 30,002.

THE STATE OF KANSAS, ex rel. WILLIAM A. SMITH, Attorney-general, *Plaintiff,* v. J. C. RUBOW, *Defendant.*

(4 P. 2d 443.)

Opinion filed November 7, 1931.

*Roland Boynton,* attorney-general, *R. O. Mason,* assistant attorney-general, and *A. A. Hotchkiss,* county attorney, for the plaintiff.

*J. T. Pringle,* of Burlingame, and *A. K. Stavely,* of Lyndon, for the defendants.

The opinion of the court was delivered by

SLOAN, J.: This is an original action in quo warranto brought for the purpose of declaring a forfeiture of the defendants' offices as county commissioners of Osage county for willful misconduct in office under what is known as the unfaithful-officers act.

The cases, for convenience, have been consolidated. The first count in each of the petitions are identical. There are other counts in each petition which have been disposed of either by failure of the plaintiff to introduce any testimony in support thereof, or a

finding in favor of the defendants by the commissioner, which finding is not questioned by the state. We are therefore concerned only with the first count in each petition, and they will be considered together.

. It is alleged that the returns of the deputy assessors in Osage county for the assessment year 1930 showed a population of less than 20,000 inhabitants; that the defendants willfully added names and numbers to the enumeration records in order to increase the population returns above 20,000, thereby increasing their salaries; that the names and numeral additions were not made according to law and were not the names and numbers of *bona fide* residents of the county, and the defendants had no right or authority to amend or correct the enumeration records. The court appointed Hon. Donald A. Campbell, special commissioner, to hear the testimony and make findings of fact and conclusions of law. The findings of fact and conclusions of law made by the commissioner relating to the first count in the information are as follows:

"FINDINGS OF FACT.

"I. Will S. Duncan, defendant in case No. 30,001, is serving his first term as a county commissioner of Osage county, which commenced January 14, 1929. His district is the third and is comprised of Barclay, Arvonia, Olivet, Melvern, Lincoln and Agency townships, and approximately the south half of Valley Brook township, the district being roughly the south two-fifths of the county. His residence is in Olivet township, of which he was trustee prior to taking office as commissioner.

"II. J. C. Rubow, defendant in case No. 30,002, is serving his second consecutive term as county commissioner of Osage county, which commenced January 14, 1929. His district is the second and is comprised of Ridgeway, Elk, Fairfax and Junction townships, and parts of Superior and Valley Brook townships, the district being roughly the east half of the north three-fifths of the county, extending to and including, however, the first ward of Osage City in Superior township. He resides in Lyndon.

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"THE CENSUS MATTER—BOTH CASES.

"IV. The 1930 annual enumeration of Osage county was made by the deputy assessors of the respective townships from sometime in March until about the middle of May. They were given small books with ruled pages arranged alphabetically, with a column in the center of each page headed, 'Total No. of Persons in Family.' In the front of each book was pasted a set of typewritten instructions by the county clerk, directing the enumerator to call at each home in his territory and ascertain the name of each person whose place of abode was in Osage county on March 1, 1930; to list alphabetically the name of the head of the family, the name of the wife, and the

names of children, with the age of each person listed; to include residents of the county who were temporarily absent; and to disregard the column headed, 'Total No. of Persons in Family.' At a meeting, however, about March 1, when the county clerk was instructing the deputy assessors respecting their assessment and enumeration work, the written instructions in the books were varied by some oral instructions to the effect that the names of the children need not be set out, but only the number of children under the name of the male.

"V. Twenty-seven enumeration books were used in the county census, more than one being used in some townships and extra ones being used for cities. All of these books were introduced in evidence. A detailed examination of them discloses that, aside from minor details, seven different methods were used by the various deputy assessors in listing the population:

"1. Names of men and women with the number of children shown by using the word 'children' followed by a number.

"2. Names of men and women with a number after a name showing the total number in the family, the number of children not being separately shown.

"3. Names of men, names of women and names of children.

"4. Name of head of family, man or woman, followed by a number showing the total in the family, the number of children not being separately shown.

"5. Men's names followed by a number indicating total number of males in family, women's names with similar number showing total number of females in the family, the number of children not being separately shown.

"6. Names of men and women, and after the head of the family, usually the man, a number to indicate the number of children without using the word 'children.'

"7. Names of men with names of male children, names of women with names of female children, and also a number after the head of the family showing total in the family.

"With one or two possible exceptions, examination of the book itself discloses the method used by the enumerator—the principal question in most cases being whether the numbers were used to designate the total in the family or only the total number of children. Any doubt as to method was easily capable of removal by inquiry of the deputy assessor.

"VI. When the deputy assessors had completed their enumeration the books were filed in the county clerk's office, during a period from about April 19 to May 19; and when not in use the books were normally kept in the vault in that office.

"VII. Shortly after the books were filed by the deputy assessors a tabulation of the totals was made in the clerk's office, as well as a comparison with the enumeration of previous years. This showed the population of the county to be between 17,500 and 18,000. The population of the county certified for the year 1929 and several previous years was between 20,000 and 25,000, which limits had been the basis determining all matters governed by population, including salaries.

"VIII. The fall in population indicated by the deputy assessors' returns was called by the county clerk to the attention of the county commissioners

with the suggestion that they examine the books to see if any names had been omitted which should be included; and at the request of the commissioners the books were delivered to them and they had them in their possession much of the time during the period while holding their equalization session. When not in actual use by some one, the books were left on the table in the county commissioners' room, the doors of which were open. Individuals having business before the board of equalization, as well as various county officers, employees and others were in and out of the commissioners' room, and from time to time the books were inspected by the commissioners and others, principally county officers; and various people engaged in conversation in the commissioners' room relative to the enumeration.

"IX. The subject of the fall in population and its effect as a basis on which to pay salaries was one of general discussion about the courthouse, known to and participated in by the county commissioners as well as many of the other officers and employees there.

"X. After the enumeration books came into the possession of the county commissioners, many changes were made in some of them by the commissioners, as well as others about the courthouse, consisting in the addition of names of individuals and groups, and the increasing of numbers after names. Thereafter, on July 12, after a tabulation of the books, the county clerk certified to the auditor of state that the population of Osage county was 20,278; which number included all the additions made with the possible exception of three gangs totaling 210 added under page M in the Valley Brook township book.

"XI. The federal government's decennial census of Osage county was made as of April 1, and about the same time as the county enumeration. Statistics on file in the office of the state board of agriculture show that the federal enumeration of Osage county as of that date was 17,538. (Population Bulletin of United States Department of Commerce, 1930, page 6.)

"XII. Several times during the period from July 12 until early in October a number of citizens, having heard of the substantial difference between the population shown by the federal census and that certified by the county clerk, held conferences with the county commissioners, discussing whether errors or changes had been made in the enumeration books. The commissioners' explanation was that too many names had been omitted. On these occasions they did not advise the citizens that changes had been made in the books, and on one occasion they stated they knew of no changes having been made. At one time the defendant, J. C. Rubow, stated that the commissioners were abiding by what the clerk had certified. They said if any mistakes had been made the same should be corrected and that the books were available for inspection. Several requests of the citizens that the commissioners call the deputy assessors in, to check the books, did not meet with their acquiescence, the commissioners stating that they did not deem it necessary. Finally, on October 6, request was again made that the deputy assessors be called in. The suggestion was then made by Mr. Tindell that the books be checked by the commissioners and the county clerk without calling in the deputy assessors; but it was urged by the citizens that the deputy assessors

should check the books. The commissioners then set October 9 as the date when the deputy assessors should examine their books. No formal order was issued to them for this meeting, but request to attend was made upon those of the deputy assessors that could be reached. About ten or twelve of them came to the meeting in the commissioners' room on October 9 and examined their books, in whole or in part. At least five of them indicated on sheets of paper certain names and numbers to be added to or subtracted from their books. These amendments (defendants' exhibits 2, 17, 18, 19 and 20) were sworn to and filed in the county clerk's office. These amendments, some of which are not clear, increased the total in the books concerned by forty-six, or decreased it by fifty-four, depending on the interpretation placed upon the amendments.

"XIII. While the October 9 recheck was in progress a large body of citizens were holding a meeting in the courthouse assembly room. Committees appointed by them, accompanied by some of the citizens, waited upon the commissioners and the group became engaged in a spirited and somewhat protracted discussion with the commissioners as to whether the citizens might have a committee present with the various deputy assessors while their books were being checked, how large the committee should be, and by whom chosen —by the commissioners or the citizens. During this argument there was on the part of some of the participants some 'suppressed emotion' and some 'expressed' on the part of others. However, the examination of their books was finished by nearly all of the deputy assessors present before this discussion, which finally resulted in the appointment of one representative for each deputy assessor, was well under way.

"XIV. On November 7, 1930, the board of county commissioners received from the county clerk her certificate of that date stating that on the October 9 recheck, made by the deputy assessors, the population of Osage county was found to be less than 20,000 and more than 17,500 as of June 10, and that the former certificate of population of July 12 was found to be incorrect by reason of errors in listing and tabulation. A resolution was then passed by the board of county commissioners on that day, reciting the county clerk's certificate and ordering that all matters governed by population be determined by the statutory requirements relating to counties having a population of more than 17,500 and less than 20,000. The commissioners did not thereafter determine upon a definite figure between those limits for the population of Osage county. They considered the matter of putting the lower population basis into effect as of June 10, 1930, but upon learning of an opinion by the attorney-general's office that such a change would not be effective until the ensuing official year, the plan was not followed.

"XV. After the enumeration books came into the possession of the commissioners, changes were made by the defendant Will S. Duncan, by adding names and numbers as here shown in the following books:

Olivet city, Pltf's Ex. 2, page C, Construction Co........................ 50
Arvonia township, Pltf's Ex. 3, page G, gravel gang....................... 50
Barclay township, Pltf's Ex. 4, page S, construction gang................. 50
        track gang ............................ 60
        signal gang ........................... 40

Superior township, Pltf's Ex. 5, page M, construction gang............... 100

signal gang .................... 50

Agency township, Pltf's Ex. 6, page L, Lomax track men................ 60

Lomax signal gang............... 40

Quencmo city, Pltf's Ex. 7, page M, Mexicans......................... 25

Valley Brook township, Pltf's Ex. 9, page M, M. P. track men........... 60

signal gang .............. 50

construction gang ......... 100

Melvern city, Pltf's Ex. 11, page M, Mexicans.......................... 10

"XVI. Many changes were made in the Elk township enumeration book after it was filed in the county clerk's office by the deputy assessor. This was one of the books to which the defendant, J. C. Rubow, gave special attention. While going about the township making his enumeration the deputy assessor used a separate book of his own, afterward copying the entries in the official book (plaintiff's Ex. 12) before filing it in the clerk's office. His method, which was to show men's names on the left page, women's names on the right page, with only a number after the head of the family, usually the man, to indicate the number of children, was substantially in accordance with the county clerk's oral instructions. At or about the time of the October meeting he first learned of the changes made, and at the trial of these cases testified thereof at great length and in detail by comparison of the two books. His testimony, supplemented by an examination of the book itself, shows that at least 51 individual names were added, which with the numbers raised and added, increased the enumeration 429 in excess of that originally shown by the book.

"XVII. Nearly all of the changes made in the Elk township book were actually written by the county treasurer, acting, however, in coöperation with and at the suggestion of the defendant, J. C. Rubow, this taking place sometime during the period while the books were in the possession of the commissioners. Mr. Rubow, holding and examining the 1929 Elk township book, called off names found therein, which were then entered in the 1930 book after some discussion between themselves and with those about them. In addition to numbers placed after the added names, numbers already in the book were raised.

"XVIII. Nearly all of the changes made in the Elk township book were incorrect. Some of the persons being already enumerated in the same or in another book; some of nonresidents of the county; and a few of dead persons.

"XIX. The entry in the agency township book (plaintiff's exhibit 6) of 'Lomax Track men 60' and 'Lomax signal gang 40' listed in finding number XV, was at the suggestion of the defendant, J. C. Rubow, who told Mr. Duncan he had seen their camp while riding. Mr. Duncan then inquired of the foreman of the gangs and was given the figures shown as being approximately correct for each gang.

"XX. Names in other books were added by or at the instance of the defendant Rubow, including some in the Fairfax township, Ridgeway township and Carbondale city books.

"XXI. Sometime after the delivery of the books to the commissioners, the county clerk added 'Construction Co. 42' on page C of the Quenemo city book

(plaintiff's exhibit 7) and 'Cook & O'Brien Const. Co. 100' on page C of the Olivet township book (plaintiff's exhibit 1) at the instance and suggestion of the three county commissioners.

"XXII. In totaling the books for Lincoln township and two of the four books for Burlingame township and city, an erroneous tabulation was made in the county clerk's office, said to be due to a misunderstanding of the deputy assessor's methods of showing the number in the family after the names, with the result that part of the names not having a number in the Lincoln book and all those in the Burlingame books were included in the total in addition to the numbers showing total in the family. From an examination of these books it appears that original totals, now erased, were correct, and the later ones caused error; and that the meaning of the numbers intended by the deputy assessor is easily ascertainable. At all events, the error of about three hundred in excess of the true count of these books is not attributable to the defendants.

"XXIII. There were some instances, comparatively few, where names that should have been included in the books by the deputy assessors in the 1930 enumeration were inadvertently omitted.

"XXIV. Some of the gangs added to the books by the defendant Duncan were not in the townships on March 1, 1930, nor discovered by the .deputy assessor at the time he made his enumeration. The personnel of the gangs was in most cases of a shifting character, living in bunk cars or in tents in the vicinity of their work, and except for a few individuals in the gangs already listed as residents by the deputy assessors, were in the county temporarily for purposes of employment only, and in some cases for a very short period.

· "XXV. Where names were added or numbers raised by the defendants, no previous consultation was had with the deputy assessors of the township in question as to the propriety of the entries, nor as to any possible misunderstanding of the numbers shown after names; nor was any actual independent investigation made by going to the neighborhood where the persons were supposed to reside; but the changes were based upon the defendants' general familiarity with the people in the territories involved and their supposed knowledge respecting their residence and families. In cases of the addition of gangs, the numbers shown were usually based upon an estimate, in most cases furnished by an agent or foreman, and not upon an actual count, nor upon any inquiry as to whether the personnel of the gangs were residents of the county or had families.

"XXVI. In the three years previous to 1930, when the deputy assessor's books showing enumeration had been returned to the county clerk's office, they were in each instance found to show the population below 20,000. In 1927 and 1928 the county clerk's practice was to require the deputy assessors to remain or come back to recheck the books with the county clerk with the result that sufficient names, including gangs, were added to the books to bring the population above 20,000. In 1929, due to the unwillingness of the deputy assessors to take the extra time necessary to do this, most of them consented that the rechecking might be done in the clerk's office without their presence and the result was the same.

"XXVII. Before undertaking to add names and numbers to the enumera-

tion books, the county commissioners did not consult the county attorney for an opinion as to their right or authority to do so.

"XXVIII. In no instance during their amendment of the enumeration books did the defendants strike off names of persons therein or reduce the number of persons in the family.

"XXIX. While undertaking to amend the enumeration books, the defendants failed to exercise reasonable diligence and care to ascertain from normal and appropriate sources the propriety of adding names of persons and groups, involving the questions whether they were previously listed or were actual residents of the county.

"XXX. The circumstances shown by all the evidence under which the changes in the books were made by the defendants lead to the conclusion here made as a finding that the changes were made by the defendants with the knowledge and consent of each other.

"XXXI. The purpose of each of the defendants in making the additions and changes in the enumeration books was to prevent the population from being certified below 20,000 and to prevent a reduction in the compensation which they and other county officers would be entitled to receive under the law.

. . . . . . . . . . . . . .

"XL. In obedience to subpœnas issued by the assistant attorney-general in an inquisition conducted by him at Lyndon on November 6, 7, 8 and 10, the defendants Duncan and Rubow were compelled to and did give their testimony over their protests respecting the matters involved in these suits."

"CONCLUSIONS OF LAW.

"The following are my conclusions of law:

"I. The fact that the defendants were compelled to testify in the assistant attorney-general's inquisition as to matters involved in the present actions is not a ground for the abatement or in bar of these actions.

"II. Under chapter 11 of the Revised Statutes of 1923, sections 11-101 to 11-113, inclusive, relating to census, and particularly section 11-112, relating to annual local enumeration of residents, the duty and authority to make the enumeration rested solely with the deputy assessors; and the sole duty of the county clerk was to furnish them with the necessary books and blanks for that purpose and to ascertain from their returns the total number of residents and certify the same to the state auditor.

"III. The county commissioners had no duty or authority respecting the taking, supervising or amendment of the enumeration of the county.

"IV. Under chapter 11, R. S. 1923, and section 11-112 thereof, only such persons having a legal residence or place of abode in the county on March 1 are to be included in the enumeration, whether temporarily absent from the county or not; and the status of such persons is to be ascertained in the modes prescribed by R. S. 1923, section 11-106.

"V. The personnel of construction gangs and other groups only temporarily in the county for purposes of employment, or otherwise, were not persons intended to be numerated within the meaning of the numeration statutes.

"VI. The acts of each of the defendants in cases Nos. 30,001 and 30,002 in making changes in the enumeration books, done for the purpose, in the manner and under the circumstances shown in the foregoing findings of fact, constitute willful misconduct in office within the meaning of R. S. 1923, section 60-1609; and warrant judgments of ouster in both cases."

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

It is first contended by the defendants that they were required, over their objection, to be witnesses against themselves in violation of the constitution, and that they are being unlawfully prosecuted and are entitled to the privilege and immunity of witnesses under R. S. 60-1620.

The defendants, under R. S. 60-1619, were required to appear before the assistant attorney-general and the county attorney, and, over their protest, were required to testify concerning their conduct in office, and especially the changes in the enumeration books. Proper objections were made before the commissioner and it is now urged that by reason of the immunity statute this action is barred. The statute referred to authorizes the attorney-general, the assistant attorney-general and county attorney to examine witnesses, under oath, concerning violations of the statute on proper complaints, and that no witness shall be excused from testifying before such officer or any proceeding brought in any court of competent jurisdiction under the provision of the act, "on the ground that his testimony may incriminate him; but no person shall be prosecuted or punished on account of any transaction, matter or thing concerning which he shall be compelled to testify; nor shall such testimony be used against him for any crime or misdemeanor under the laws of this state." (R. S. 60-1620.)

The constitutional guaranty protects a person against self-incrimination and he cannot be compelled, when called as a witness in any investigation, to give testimony which might tend to incriminate him or subject him to a criminal action. The immunity statute, to be valid, must be coextensive with the constitution and fully protect the witness from prosecution or punishment on account of any transaction, matter, or thing concerning which he is compelled to testify. The immunity must be tantamount to the privilege. The immunity afforded by the statute under consideration is coextensive with the constitutional privilege, and therefore valid. (*State v. Jack*, 69 Kan. 387, 76 Pac. 911; *Brown v. Walker*, 161 U. S. 591.)

There has been much discussion as to the extent of the constitutional guaranty, but the rule, we think, is well settled that it is

limited to criminal matters (*Counselman v. Hitchcock*, 142 U. S. 547) and this is especially true in this jurisdiction. (*State, ex rel., v. City of Topeka*, 36 Kan. 76, 12 Pac. 310.)

This court has held that an action under the unfaithful-officers act is a civil action, not criminal, in its nature. (*State, ex rel., v. Carl*, 120 Kan. 733, 245 Pac. 150.) It does not have any of the characteristics of a criminal action. Courts of other states may have reached a different conclusion under similar statutes. It is, however, settled in this jurisdiction that the action is civil in its nature and therefore does not come within the constitutional privilege, and the defendants cannot claim immunity.

It is further contended that the defendants acted honestly and in good faith, and that the evidence adduced by the state does not overcome the presumption of good faith. An analysis of the evidence adduced and the findings of fact made by the commissioner convince us that the findings of fact are supported by substantial evidence. We do not understand that the defendants contend that any of the findings of fact, so far as they relate to the overt acts of the defendants, are not supported by substantial evidence. The acts with which the commissioners are charged were, for the most part, admitted by them on the witness stand. The defendants, however, earnestly contend that, taking into consideration all of the facts and circumstances in the case, while the defendants may have to some extent violated their official duty, they were acting honestly and in good faith.

It should be said at the outset that the petition filed against the defendant, Duncan, charges him with the misuse of public funds and the unlawful purchase of property from the county; that the petition against the defendant, Rubow, charges him with intentionally permitting the defendant, Duncan, to convert and appropriate the property of the county to his own use, and in the unlawful sale of property belonging to the county. The state failed in its proof to establish any of these charges, and the commissioner's findings are approved by the court. This leaves for our consideration only the question of the alleged changes in the enumeration books.

An original action in this court under the unfaithful-officers act places the responsibility on the court of determining the facts as well as the law. The findings of the commissioner are persuasive, but not binding. We must examine the evidence, and the writ of ouster cannot issue unless there has been a willful violation of

official duty prompted by a bad or corrupt purpose, and without any reasonable grounds to believe that the action is lawful. Mere departure from the letter of the law will not warrant a judgment of ouster, unless it is prompted by an evil design. (*State, ex rel., v. Trinkle*, 70 Kan. 396, 78 Pac. 854; *State, ex rel., v. Foley*, 107 Kan. 608, 193 Pac. 361.) The county commissioners are vested with the general control and supervision of the affairs of the county. They are vested with discretionary powers and must necessarily be guided by their judgment. An error in judgment does not come within the purview of the statute, but unlawful acts prompted by a corrupt purpose and bad faith warrant a judgment of ouster. The motive back of conduct is not always easily determined. We cannot read the human heart, but must content ourselves in determining motive and purpose from words, acts and consequences.

The evidence shows, and the commissioner finds, that the returns of the assessors showed the population of the county to be between 17,500 and 18,000; that in the year 1929 the population was between 20,000 and 25,000. Under the statute, when the population of any county is less than 20,000, a substantial decrease in the salaries of county officers is effected. As far back as 1927 difficulty had been experienced in keeping the population of the county over 20,000. In 1927 and 1928 the assessors were called back and asked to recheck their books in order to bring the population above 20,000, while in 1929 the assessors were unwilling to return to revise the books and consented that the county clerk recheck them. This indicates that there was a serious question whether the population of the county exceeded 20,000 and in order to make up the 20,000 in the prior years road gangs and other temporary labor organizations were added to the books. When the return was made in 1930 the clerk called the commissioners' attention to the fact that the enumeration as returned was less than 20,000 and the books were then delivered to the county commissioners and held in their possession during the equalization session. It would seem that the commissioners, under such circumstances, knowing that the enumeration in the previous years had been questioned by the county clerk and perhaps other county officers, and that a revision was necessary in order to retain the 20,000 population classification, would have been placed upon inquiry, and that good faith in the performance of their official duty would have required them to have examined and inquired into the enumeration, together with the manner in

which it was taken, with the closest scrutiny. Good faith would dictate, when confronted with this problem, that they counsel the proper legal authority as to their rights and responsibilities in the premises. They were confronted, in the first place, with the question as to whether the commissioners had any control or authority over the enumeration. Had· they consulted the statute and the decision of this court (*State, ex rel., v. Montgomery County ·Comm'rs,* 125 Kan. 379, 264 Pac. 84) they would have been fully advised that the taking of the enumeration of the county was no part of their official duty and that they were bound by the return of the assessors when made as provided by law.

Prudence dictates that inquiry should be made as to the date of the enumeration and who should be included therein. We are not unmindful of the fact that the statute is indefinite, and requires the consideration of its history and its relation to other statutes to determine the date fixed for the enumeration. This statute and its history was considered by this court in *Sickly v. Allen County,* 83 Kan. 740, 112 Pac. 621, and held not to be repealed by the subsequent acts of the legislature. The office of assessor was created primarily to list the taxable property of his district, and such property is listed as of the first day of March. (R. S. 79-309.) The census made under the direction of the state board of agriculture is taken on the first day of March. (R. S. 11-107.) An enumeration of the residents of the county or district can be of little value or certainty unless taken at a specific date. When taking into consideration the numerous statutes relating to the duties of the assessor we are convinced that it was the intent of the legislature that the enumeration provided for in R. S. 11-112 should be taken as of the first of March, including only the persons residing in the township or city on that date.

The record clearly shows that the defendants did not make any investigation or inquiry of the county attorney to advise themselves concerning the fundamental questions involved in the making of an enumeration—authority to act, the date and who should be enumerated. Their conduct clearly indicates that the motive which prompted them to act in the matter was to keep the county in the 20,000 classification, and consequently avoid a decrease in their salaries and the salaries of other officers.

The defendant, Duncan, listed in the books of his district, "construction gang," "track gang," "signal gang" and "Mexicans" in

numbers from ten to one hundred, without any investigation on his part as to the personnel of such gangs to determine whether they were residents of the county and the number in each gang. The number in the gang was not arrived at from any reliable information, and it is a matter of common knowledge that such gangs are largely made up of transients. The listing was unlawful, but by this means the enumeration was increased 745.

The defendant, Rubow, aided in the listing of the gangs and under his direction names and numbers were added to the books in his district increasing the enumeration 429. Many of these additions were not residents of the township, some were dead and others did not exist at all.

Considering these facts, together with all of the other circumstances in the case, we cannot reconcile such conduct with good faith. Mistakes of judgment should be excused, but where county commissioners take charge of the enumeration books and without any authority assume to revise the work of the assessors and add to the enumeration the names of persons whom they must have known, or with any reasonable degree of inquiry could have ascertained, could not under any stretch of the imagination be listed as residents of the county, the presumption of good faith is overcome and we think the commissioner was fully warranted in finding from the evidence that the purpose of the defendants in making the additions and changes in the enumeration books was to prevent the population from being certified below 20,000, and avoid a decrease in their salaries. The court has made a painstaking examination of the evidence and we are brought to the same conclusion as was the commissioner, that the defendants are guilty of willful misconduct in office within the meaning of the statute.

Judgment of ouster is entered.

SMITH, J., not sitting.