IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 110,835

STATE OF KANSAS,
*Appellee*,

v.

DAVID SCOTT MORRISON, WARD 5 COUNCILMAN, CITY OF PRAIRIE VILLAGE,
JOHNSON COUNTY, KANSAS,
*Appellant*.

SYLLABUS BY THE COURT

1.

Judicial ouster of elected public officials is a drastic remedy and is available only on a showing of serious wrongdoing.

2.

Out of respect for the separation of powers and in the interest of appropriate judicial restraint in the face of political questions, only in exceptional circumstances should publicly elected officials be removed prior to the completion of their terms.

3.

A bad or corrupt purpose is not synonymous with illegal conduct or conduct that is not justified under the given circumstances.

4.

In order to find willful misconduct justifying judicial ouster from public office, a court must find both a bad or corrupt purpose and illegal action or inaction that was not justified under the given circumstances.

1

Review of the judgment of the Court of Appeals in 50 Kan. App. 2d 1001, 335 P.3d 1204 (2014). Appeal from Johnson District Court; DAVID W. HAUBER, judge. Opinion filed October 2, 2015. Judgment of the Court of Appeals reversing the district court is reversed. Judgment of the district court is reversed and remanded with directions.

*Rex A. Sharp,* of Gunderson Sharp, LLP, of Prairie Village, argued the cause, and *Barbara C. Frankland,* of the same firm, *J. Brett Milbourn*, of Walters Bender Strohbehn, PC, of Kansas City, Missouri, and *Thomas J. Bath, Jr.,* of Bath Edmonds, PA, of Overland Park, were with him on the briefs for appellant.

*Steven J. Obermeier*, assistant district attorney, argued the cause, and *Stephen M. Howe,* district attorney, was on the briefs for appellee.

The opinion of the court was delivered by

ROSEN, J.: The State of Kansas brought a quo warranto action pursuant to K.S.A. 60-1205 to remove David Scott Morrison from his position on the Prairie Village City Council. After conducting a hearing, the district court concluded that the evidence was sufficient to show that Morrison willfully engaged in misconduct while in office and willfully neglected to perform a duty enjoined upon him by law. Consequently, the district court entered an order removing Morrison from office pursuant to K.S.A. 60-1205(1) and (2).

Morrison appealed, and the Court of Appeals concluded that the undisputed facts did not, as a matter of law, satisfy the criteria for judicial ouster established by caselaw applying K.S.A. 60-1205. The Court of Appeals reversed the district court and remanded the case with directions that judgment be entered in Morrison's favor, thus reinstating him to his public office. We granted review and conclude that, based on the applicable statutory language and caselaw, both the district court and the Court of Appeals

2

misapplied the standard required for ouster under K.S.A. 60-1205(1) and (2). As a result, we reverse both the district court and the Court of Appeals and remand the case to the district court for further proceedings consistent with this opinion.

FACTS

The parties do not dispute the facts of this case. The Court of Appeals' recitation of the facts is quoted below.

"Morrison was elected to the Prairie Village City Council in 2008 and re-elected in 2012. Kelley Malone was Morrison's long-time friend and a former coworker. In 2011, Malone began to have substance abuse problems. Eventually, Malone lost his job and became homeless. At this point, Malone called Morrison seeking help, as he believed he had nowhere else to turn. Morrison arranged for Malone to stay in a hotel for a week, bought him clothes, and set up a job interview for him. With employment, Malone's circumstances improved and he was able to purchase a home.

"Unfortunately, the following year Malone relapsed. He again lost his home and feared for his life because he came to believe that a 'hit' had been taken out against him. On Saturday, October 27, 2012, Malone again sought Morrison's help. Morrison called his church seeking both advice and sanctuary for Malone. A pastor informed him that the church could not accommodate Malone and, further, that putting Malone in a hotel was ill-advised. Morrison then called a Prairie Village dispatcher, Dawn Johnson, to inquire into public resources available to assist the homeless. Johnson told Morrison that the usual practice was for a police officer to take the person to the City Union Mission in Kansas City, Missouri. Morrison arranged a spot for Malone at the City Union Mission, however, Malone refused to go as he did not believe it was a safe location. Morrison did not consider his own home a viable place for Malone to stay as Morrison lived with his elderly parents. Morrison's mother's immune system was so compromised that Morrison himself would check into a hotel when he contracted an illness or cold so as not to expose his mother to illness. Morrison feared a stranger in his home would endanger his mother's fragile health.

3

"At a loss, Morrison made the fateful decision to house Malone in city hall for a few days. The Prairie Village City Hall and police station are located in the same complex, separated by a long corridor. Access to city hall after normal business hours requires entering the police station, walking past the dispatch window, and passing through a locked door opened using a four digit security code. Each city councilman had a unique security code, though there were no policies or restrictions as to how those security codes could be used. The security code permitted access to the employee lounge, a weight room, and a locker room but not to any work spaces or other areas of city hall.

"That Saturday evening, Morrison brought Malone to city hall around 6 p.m. Morrison walked to the dispatch window where Johnson was working and told her that he and Malone were there for a neighborhood meeting. Morrison also told Johnson not to be alarmed if she saw Malone on the surveillance cameras as he was with Morrison. Johnson was suspicious of Morrison's explanation and sent the following message to a Prairie Village police officer:

> 'Ok, you know the homeless guy I told you David Morrison was calling about? Well he just took him over to city hall. Telling me "they" were having a meeting with the rest of the neighborhood . . . . Surely he wouldn't let that guy stay the night over there would he? I don't know of any meeting . . . not that that matters.'

"At some point, Morrison and Malone left city hall to get dinner, returning at about 9 p.m. Pamela Huskey was working at the dispatch window when they returned and Morrison told her that he and Malone would be working in city hall that night. Twenty minutes later, Morrison left while Malone stayed to spend the night. Before leaving, Morrison gave Malone his security code after realizing that without it, Malone would not have restroom access.

"The following morning, the janitor saw Malone in the city hall employee lounge. Just after noon, Morrison picked Malone up and the two attended a football game that evening. They returned to city hall just after midnight on Monday morning, October 29, 2012. Morrison told the dispatcher on duty, Cory Parker, that he and Malone were going to do paperwork in city hall. Morrison left a few minutes later. Malone again spent

4

the night in city hall, leaving mid-morning on Monday and not returning for the rest of that day. He spent Monday night sleeping in the back of another friend's car.

"That same day, Morrison called Police Chief Wes Jordan to discuss Malone's situation. Morrison described Malone's current drug addiction and told Chief Jordan that Malone had information about drug transactions and human trafficking operations. Chief Jordan instructed Morrison to have Malone contact him so he could meet with the Special Investigations Unit, a police unit primarily focusing on drug crimes. Neither Malone nor Morrison contacted Chief Jordan to arrange a meeting time.

"The following evening, Tuesday, October 30, 2012, Malone again called Morrison and asked to stay the night at city hall. Morrison told Malone that he did not think it would be a good idea, however, Malone ignored Morrison's plea. Malone arrived at city hall just after midnight on Wednesday, October 31, 2012. Malone told Huskey, who was again working the dispatch window, that he and Morrison were going to be working again in city hall and that Morrison would be arriving soon. Malone then entered city hall. Morrison never arrived.

"That morning, multiple city hall employees encountered Malone. Bettina Jamerson, the court administrator, encountered Malone at 7:30 a.m. as he was sitting in the employee break room. She reported Malone's presence to Officer Kyle Shipps. Officer Shipps confronted Malone and asked him why he was in the employee break room. Malone replied that he was there to meet with Morrison and Chief Jordan. Penny Mann, another employee, saw Malone in the break room around 8 that morning. She asked if she could help Malone, and he told her that he was waiting for Morrison to arrive with an attorney. Likewise, employee Sheila Hopkins saw Malone around 8:30 that morning when she entered the break room and saw Malone talking on a cell phone. Unsure of whether he was supposed to be there, Hopkins asked Malone if there was anything she could do for him. Malone responded by giving Hopkins 'a really dirty look.' Malone noisily gathered his things, left the break room, and went to the locker room.

"When Chief Jordan arrived at work, Officer Shipps told him that Malone was waiting to meet with him. Chief Jordan found Malone in the locker room and escorted him back to the police station. Malone told Chief Jordan that he was dropped off by Morrison around 7 a.m. that morning. Chief Jordan attempted to call Morrison but was unable to reach him. Chief Jordan deactivated Morrison's security code and initiated an investigation to determine when Malone had actually been in city hall.

"Following the investigation, the Prairie Village City Council voted to oust Morrison from his position." *State v. Morrison*, 50 Kan. App. 2d 1001, 1002-05, 335 P.3d 1204 (2014).

On January 17, 2013, the State filed a quo warranto petition requesting that Morrison be removed from office pursuant to K.S.A. 60-1205. The State contended that Morrison's actions in giving his security code to Malone and allowing him to spend several nights in city hall violated sections of Prairie Village's City Code and, in addition, constituted the crimes of official misconduct, trespass, and theft. The State alleged that Morrison should be ousted from office based on him (1) willfully engaging in misconduct while in office; (2) willfully neglecting to perform any duty enjoined upon him by law; and (3) committing criminal acts involving moral turpitude. See K.S.A. 60-1205(1), (2), and (4).

The case proceeded to trial, where an advisory jury concluded that Morrison did not commit any criminal acts involving moral turpitude. The jury did conclude, however, that Morrison, based on his acts of giving Malone his access code and allowing him to stay at city hall, intentionally or purposefully engaged in misconduct and neglected to perform a duty mandated by law. The district court adopted the findings of the advisory jury and concluded that Morrison's actions violated 1-212(e)(6)(b) and (g) of the Prairie Village City Code. Those two provisions precluded a council member from granting "in the discharge of his or her duties any improper favor, service, or thing of value" and from permitting the use of city property "for personal convenience . . . except when such services are available to the public generally." Code of the City of Prairie Village 1-212(e)(6)(b) and (g). The district court reasoned:

"Arguably, allowing Mr. Malone to stay in City Hall for four nights was an improper favor of value. . . . . The evidence is unrebutted from the city administrator, Quinn Bennion, that City Hall was not available for overnight residency to the public in general.

6

. . . Mr. Morrison, the evidence shows, used city property for his own convenience to meet his need to demonstrate to his friend that he was important enough to allow him access unavailable to the public in general. This was a personal benefit to Mr. Morrison."

The court not only found that Morrison's actions violated the city code but that his testimony at trial explaining that he thought his actions were justified because of the lack of "restrictions or policy on how he could use his code, or even whether it could restrict any 'guests' he might bring into the city portion of the complex" was not believable. The court recounted the evidence presented at trial regarding when Morrison first brought Malone to city hall on the evening of Saturday, October 27, 2012:

"[Morrison] picked up Mr. Malone and brought him to the dispatcher window where Ms. Johnson was still on duty. According to Ms. Johnson's testimony, Mr. Morrison made it sound as though he had a neighborhood meeting and that Mr. Malone would be there for that. This conversation is somewhat disputed. On direct, Mr. Morrison testified: 'And as I recall it, I think I said I was going to be meeting with Kelley and that I had to pick up some stuff for a homes association meeting . . . . Yeah, I had to pick up some material or some stuff for a homes association meeting, *which I did while I was there*.'

"While Mr. Morrison attempted to recharacterize this conversation as a 'miscommunication,' the Court finds that his testimony was not credible. It attempted to undermine Ms. Johnson's clear recollection that Mr. Morrison told her there was a neighborhood meeting and Mr. Malone was there in conjunction with the same. Ms. Johnson had her suspicions because this was the same individual Mr. Morrison had called about earlier. That Mr. Morrison had lied about the reason for Mr. Malone's presence and then sought to spin this same conversation in court, is particularly disturbing. Lies revealed themselves such as when the State challenged the homes association 'packet' that Mr. Morrison suggested he was there to pick up. When the State was poised to play a surveillance video from that first evening, after Mr. Morrison stated on direct that he had picked up the packet, Mr. Morrison acted as though his direct testimony had only indicated he intended to look for a packet. On cross examination, he testified that he did not pick up the packet because he 'remembered' he already had gotten the same earlier.

*This was a significant line of testimony because the intent to lie and misrepresent is reflective of the fact that Mr. Morrison knew that what he was doing was wrong.*

. . . .

". . . What is more serious is why Mr. Morrison felt compelled to misrepresent the reason for Mr. Malone's presence if he were secure in his belief, as he testified, that he could bring whoever he wanted into City Hall. This bit of bravado, however, is negated by the actual cover used to slip Mr. Malone into City Hall, which depended on a subordinate employee not questioning a city council member. In other words, Mr. Morrison depended, to a certain extent, on not being questioned. At trial, however, he was questioned, and he was willing to misrepresent to the Court the truth of what happened." (Emphasis added.)

In addition to finding that Morrison had lied to the dispatcher about the reason for Malone's presence inside city hall outside of regular business hours, the court noted that Morrison had "neglected to mention any of the circumstances attendant on Mr. Malone's stay to either the city administrator or city attorney, who could have directed Mr. Morrison to the city's conflict of interests policy."

Based on its findings that Morrison's actions violated two separate provisions of the city code, that his actions could not be explained by an honest but mistaken belief that they were legal or justified, and that Malone's presence inside city hall created unnecessary health and safety risks for city employees, the district court concluded that Morrison should be removed from office based on K.S.A. 60-1205(1) and (2). Morrison appealed the district court's order and filed a motion pursuant to K.S.A. 2014 Supp. 60-262(d) to stay the order, but the district court denied the motion.

Before the Court of Appeals, Morrison did not contest any of the factual findings made by the district court but raised several purely legal arguments that could be distilled into one overarching contention: the district court applied a "watered-down" legal standard for determining that ouster was justified under K.S.A. 60-1205(1) and (2).

8

Morrison contended that caselaw established that, in order for a public official's ouster to be justified under either K.S.A. 60-1205(1) or (2), the evidence must show that (1) the official's misconduct or neglect was so habitual or grave that it endangered the public welfare and (2) the official's conduct must have an evil motive of personal gain behind it.

The Court of Appeals was persuaded by Morrison's argument, stating that its

"review of prior judicial ousters of public officials in Kansas makes it clear that this remedy is available only in circumstances that show a corrupt purpose or an evil design by virtue of either (1) a persistent and habitual disregard for the law or for the official's public duty or (2) acts so egregious that they pose a grave threat either to public safety or to the public fisc." *Morrison*, 50 Kan. App. 2d at 1009.

The Court of Appeals reviewed the evidence and concluded that it was not sufficient to satisfy the legal standard that it had gleaned from its review of prior cases:

"David Morrison proved to be a clumsy benefactor. Worse, Morrison added casuistry to clumsiness when he fabricated a cover story to explain Malone's presence in city hall. But after considering the entire record and the underlying facts as determined by the district court, we are unable to find any indication that Morrison's actions arose out of an evil or corrupt motive; out of a habitual disregard for his public duty; out of a quest for selfish gain; or resulted in a serious threat to public safety.

"As the district court acknowledged, Morrison was primarily—if not wholly— motivated by his sincerely held view of his humanitarian duty to his fellow man. There is no evidence that this incident is anything other than an isolated and singular occurrence. Morrison gained no financial benefit and his actions did not threaten the public fisc. The district court expressly noted that Malone's presence at city hall did no actual harm. . . . . As such, we find that the district court erred in its application of K.S.A. 60-1205 to the facts of this case." *Morrison*, 50 Kan. App. 2d at 1010.

9

The Court of Appeals accordingly reversed the district court's decision and remanded the case with directions that judgment be entered in Morrison's favor, reinstating him to his position on the city council. 50 Kan. App. 2d at 1011. Knowing that the State was likely to file a petition for review with this court, thus staying the issuance of the Court of Appeals' mandate, see Supreme Court Rule 8.03(j) (2014 Kan. Ct. Rule Annot. 77), Morrison filed a motion with the Court of Appeals pursuant to K.S.A. 2014 Supp. 60-262(f), asking the court to stay the district court's ouster order. The Court of Appeals granted the motion, reasoning that Morrison would be irreparably harmed by being deprived of his elected office during the pendency of the State's appeal before this court.

The State filed a petition for review, which this court granted. After oral arguments were heard by this court and nearly 7 months after the Court of Appeals' order staying Morrison's ouster and 4 months after the petition for review was granted, the State filed a motion requesting that we set aside the Court of Appeals' order staying Morrison's ouster. The State argued that, based on Rule 8.03(j), the stay was rendered ineffective once this court granted review of the Court of Appeals' decision. See Supreme Court Rule 8.03(j) (if petition for review is granted, Court of Appeals decision has no force or effect and mandate will not issue until disposition of appeal on review).

WAS OUSTER APPROPRIATE?

On review, the State argues that the legal standard the Court of Appeals applied to determine whether ouster was appropriate under the facts of this case is not supported by the language of K.S.A. 60-1205 or by cases applying earlier versions of the statute. The State contends that the district court applied the correct legal standard and, in turn, properly determined that Morrison's ouster was justified under the facts of this case.

10

K.S.A. 60-1201 states: "Relief in the form of quo warranto shall be obtained under the same procedure as relief in other civil actions." K.S.A. 60-1202(2) states that quo warranto actions may be brought "[w]henever any public officer shall have done or suffered any act which by the provisions of law shall work a forfeiture of his or her office."

This case meets the statutory prerequisite for quo warranto relief. In *State, ex rel., v. Cahill*, 222 Kan. 570, 576, 567 P.2d 1329 (1977), this court recognized that "ouster is a drastic action" and that

> "actions in the nature of quo warranto are now generally held to invoke the discretionary powers of the trial court and thus the grant or denial of relief rests within its sound discretion. [Citations omitted.] This is proper and just, since minor infractions should not make such drastic relief mandatory."

See also *Barnes v. Board of Cowley County Comm'rs*, 293 Kan. 11, 17, 259 P.3d 725 (2011) (quo warranto is an equitable remedy); *State ex rel. Stephan v. Kansas House of Representatives*, 236 Kan. 45, 53, 687 P.2d 622 (1984) (quo warranto and mandamus relief are discretionary). Accordingly, ouster "should be invoked only where the evidence is clear and convincing, and the misdeeds [are] flagrant." *Cahill*, 222 Kan. at 576.

The district court's decision reflects that court's awareness that it had the discretion to grant or deny the State's request for Morrison's removal. The district court stated:

> "In a *quo warranto* action, 'the court may, in the exercise of its discretion, take into consideration the position and motives of the relator, the interest or policy of granting the remedy, the public interest, convenience, or detriment, the prospect of strife, confusion, and litigation, and unreasonable delay or acquiescence of the complaining party.' *The State, ex rel., v. Wyandotte County*, 117 Kan. 151, 230 P. 531, 535 (1924)."

11

A judicial action constitutes an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013). As mentioned above, Morrison did not challenge any of the factual findings of the district court, nor did he challenge the court's conclusion that his actions violated the Code of the City of Prairie Village 1-212(e)(6)(b) and (g). His argument on appeal, which the Court of Appeals accepted, was that his actions, despite violating the city code, were not legally sufficient to justify ouster under K.S.A. 60-1205(1) or (2). Thus, the issue before this court is whether the district court's decision to remove Morrison from office constituted an abuse of discretion because the decision was based on an error of law or was arbitrary, fanciful, or unreasonable.

In order to determine whether the court's decision was erroneous as a matter of law, we must look to the language of the ouster statute, K.S.A. 60-1205. Interpretation of a statute is a question of law over which appellate courts have unlimited review. *Jeanes v. Bank of America*, 296 Kan. 870, 873, 295 P.3d 1045 (2013). The most fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. *Bergstrom v. Spears Manufacturing Co.*, 289 Kan. 605, 607, 214 P.3d 676 (2009).

K.S.A. 60-1205 states:

> "Every person holding any office of trust or profit, under and by virtue of any of the laws of the state of Kansas, either state, district, county, township or city office, except those subject to removal from office only by impeachment, who shall (1) *willfully engage in misconduct while in office*, (2) *willfully neglect to perform any duty enjoined upon such person by law*, (3) demonstrate mental impairment such that the person lacks the capacity to manage the office held, or (4) who shall commit any act constituting a

12

violation of any penal statute involving moral turpitude, shall forfeit such person's office and shall be ousted from such office in the manner hereinafter provided." (Emphasis added.)

As is readily apparent from the statutory language, misconduct and neglect to perform duties required by law are grounds for ouster. In the context of an ouster action, official misconduct has been described as "'[a]n act done by a public officer in direct violation of a statute regulating his official duties is official misconduct within the terms of his bond.'" *State, ex rel., v. Robinson*, 193 Kan. 480, 488, 394 P.2d 48 (1964) (quoting *Farmer v. Rutherford*, 136 Kan. 298, 305, 15 P.2d 474 [1932]). In describing the type of neglect that can warrant removing a person from office, the court in *The State v. Kennedy*, 82 Kan. 373, Syl. ¶ 10, 108 P. 837 (1910), stated: "[T]he neglect contemplated must disclose either willfulness or indifference to duty so persistent or in affairs of such importance that the safety of the public interests is threatened."

In addition to proving misconduct or neglect to perform a duty required by law, the language of K.S.A. 60-1205(1) and (2) indicates that there must be evidence showing the officeholder behaved "willfully." We recognize that two lines of cases appear to have evolved in the context of the standard by which "willful" conduct is evaluated. One standard requires a threshold that includes a bad or corrupt purpose, and one requires only establishing that the action or inaction was illegal and not justified under the circumstances. These two standards are not synonymous, and we clarify today that such "willful" conduct requires both.

Confusion about the proper standard has arisen because certain prior cases suggest that a bad or corrupt purpose must be shown. See, *e.g.*, *The State, ex rel., v. Corwine*, 113 Kan. 192, 198, 213 P. 658 (1923) (word "willfully" in older statute requires showing that the officeholder's actions or inactions were based on actual or imputable bad

13

faith); *The State, ex rel., v. Wilson*, 108 Kan. 641, Syl. ¶ 7, 651, 196 P. 758 (1921) (construing older version of ouster statute, court concluded "willfully" implies wrongful motive, *i.e.*, "a bad or a corrupt purpose, an evil intent without reasonable grounds to believe the action is lawful"); *The State, ex rel., v. Foley*, 107 Kan. 608, Syl. ¶ 2, 614, 193 P. 361 (1920) (ouster statute not designed as pitfall for honest and sincere public officials who unintentionally err; paramount consideration is whether actions bear distinguishing characteristics of genuine good faith); *Kennedy*, 82 Kan. at 381 (under older statute, in order to oust county official for "corruptly or oppressively" performing duty required by law, plaintiff must show officer intentionally disregarded law for improper motives).

Another line of cases has looked not at the public official's motive but at the legal justification for the conduct. See, *e.g.*, *State, ex rel., v. Duncan*, 134 Kan. 85, 95, 4 P.2d 443 (1931) (motive is difficult to determine; courts must look to words, acts, and consequences); *The State, ex rel., v. Fishback*, 102 Kan. 178, 171 P. 348 (1917) (honest misunderstanding of statutory duties did not prevent ouster of court clerk for willful neglect to perform legal duty despite lack of bad or corrupt purpose); *The State v. Trinkle*, 70 Kan. 396, 402, 78 P. 854 (1904) (law presumes public official's acts were motivated by good faith).

Confronted with this analytic dichotomy, the Court of Appeals in our case crafted a new legal standard for determining when ouster under K.S.A. 60-1205(1) and (2) is appropriate. It appears that the court blended two statements of law. The first one derives from *Kennedy*, discussing the type of willful neglect that will justify an officeholder's removal:

> "It is not every oversight or omission within the strict letter of the law which will entail forfeiture of office. The purpose of the statute is to prevent persons from continuing to hold office *whose inattention to duty, either because of its habitualness or*

14

*its gravity, endangers the public welfare; and the neglect contemplated must disclose either willfulness or indifference to duty so persistent or in affairs of such importance that the safety of the public interests is threatened.*" (Emphasis added.) 82 Kan. 373, Syl. ¶ 10.

The second statement of law comes from *Duncan*, discussing the type of willful misconduct that may warrant removal from office:

"[T]he writ of ouster cannot issue unless there has been a willful violation of official duty *prompted by a bad or corrupt purpose, and without any reasonable grounds to believe that the action is lawful*. Mere departure from the letter of the law will not warrant a judgment of ouster, *unless it is prompted by an evil design*. (*State ex rel., v. Trinkle*, 70 Kan. 396, 78 P. 854; *State, ex rel., v. Foley*, 107 Kan. 608, 193 P. 361.) The county commissioners are vested with the general control and supervision of the affairs of the county. They are vested with discretionary powers, and must necessarily be guided by their judgment. An error in judgment does not come within the purview of the statute, but unlawful acts *prompted by a corrupt purpose and bad faith* warrant a judgment of ouster." (Emphasis added.) 134 Kan. at 94-95.

Blending these two statements of law, the Court of Appeals crafted the following standards for determining whether ouster is justified under K.S.A. 60-1205(1) or (2): Ouster "is available only in circumstances that show a corrupt purpose or an evil design by virtue of either (1) a persistent and habitual disregard for the law or for the official's public duty or (2) acts so egregious that they pose a grave threat either to public safety or to the public fisc." *Morrison*, 50 Kan. App. 2d at 1009. The first standard appears to apply to willful neglect and the second standard appears to apply to willful misconduct.

The problem with the first standard is that it is not consistent with the cases cited for assessing willful neglect. That standard applies to both single and repeated instances of neglect. See *Kennedy*, 82 Kan. 373, Syl. ¶ 10 (purpose of statute is to prevent persons

from continuing to hold office when inattention to duty endangers public welfare, either because of its habitualness or its gravity; "neglect" must disclose either willfulness or indifference to duty that is persistent or involves affairs of great importance to safety of public interests). A single instance of neglecting to perform an important duty can thus be the basis for removing a person from office. See *State, ex rel., v. McKnaught*, 152 Kan. 689, 696-97, 107 P.2d 693 (1940) (police chief witnessed fellow law enforcement officers consuming liquor in violation of state's prohibition law; court concluded police chief's ouster was appropriate based on this single instance of failing to enforce the law).

But the Court of Appeals' standard for judging willful neglect (*i.e.*, a persistent and habitual disregard) requires a showing of repeated instances of neglect in order for ouster to be justified under K.S.A. 60-1205(2). Such a standard is at odds with our precedent. Furthermore, the language of K.S.A. 60-1205(2) indicates that a single instance of neglect can result in an officeholder's removal. K.S.A. 60-1205(2) (willful neglect to perform "any duty" results in forfeiture of office); see K.S.A. 60-1202(2) (quo warranto action appropriate whenever public officer performs or suffers "any act" that works forfeiture of office).

The Court of Appeals' second standard for judging willful misconduct (*i.e.*, acts so egregious that they pose a grave threat either to public safety or to the public fisc) is not supported by the language of K.S.A. 60-1205(1) (ouster appropriate when officeholder "willfully engage[s] in misconduct while in office") or the caselaw cited above, indicating that any illegal act done intentionally and without any reasonable basis for believing that it was legal or justified can warrant an officeholder's removal.

The Court of Appeals set a standard that mandates a level of sustained malfeasance not required in our prior cases. It requires repetitive acts coupled with conduct of such a malevolent or dangerous nature as to constitute a threat of major

proportions. Such behavior is not the benchmark by which willful neglect or willful misconduct is proven. Consequently, the Court of Appeals sets too high of a standard for determining whether certain actions justify ouster under K.S.A. 60-1205(1) and (2).

While the Court of Appeals set a standard that was too high, the district court, on the other hand, failed to consider whether the proven violations under the Code of the City of Prairie Village were prompted by a bad or corrupt purpose. The district court found Morrison violated Sections 1-212(e)(6)(b) and 1-212(g) of the Prairie Village City Code by intentionally giving Malone his access code and allowing him to stay at city hall for several nights. Consequently, Morrison's conduct in secreting Malone into city hall under false pretenses showed that Morrison did not act with a good faith belief that his actions were legal or justified under the circumstances.

We are mindful that, under our Constitution, the people elect their state office holders and representatives and city and county commissioners in order to have such officials serve out their terms for which they were elected. As the Court of Appeals aptly noted: "Our courts' long history of considering judicial ouster a drastic remedy, available only on a showing of serious wrongdoing, is deeply rooted in judicial respect for the separation of powers and judicial restraint in the face of political questions." *Morrison*, 50 Kan. App. 2d at 1011.

It is only in exceptional circumstances that publicly elected officials should be removed prior to the completion of their terms. A careful review of our cases shows that, while they are at times inconsistent, they generally recognize an exceptional circumstance by requiring a bad or corrupt purpose when applying the question of willful neglect and willful misconduct under K.S.A. 60-1205(1) and (2).

17

Here, while the district court found that Morrison's conduct showed that he did not act with a good faith belief that his actions were legal or justified under the circumstances, more is required under our standard. A finding of a bad or corrupt purpose is also necessary to satisfy ouster under K.S.A. 60-1205(1) and (2).

CONCLUSION

We therefore find that the district court abused its discretion by failing to determine whether Morrison's conduct was the product of a bad or corrupt purpose. See *State v. Gonzalez*, 290 Kan. 747, 755, 234 P.3d 1 (2010) (district court by definition abuses its discretion when making an error of law; abuse of discretion standard includes review to ensure that discretion not guided by erroneous legal conclusions). The decision of the Court of Appeals is reversed. The district court's decision ordering Morrison's removal from the Prairie Village City Council is reversed, and the case is remanded for application of the standard consistent with this decision. Based on this outcome, the State's belated motion to set aside the Court of Appeals' stay of the district court's ouster order is rendered moot.

STEGALL, J., not participating.
EVELYN Z. WILSON, District Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** District Judge Wilson was appointed to hear case No. 110,835 vice Justice Stegall under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution.

* * *

JOHNSON, J., dissenting in part:  I cannot agree with the majority's holding that the district court failed to determine that Morrison's conduct was the product of a bad or corrupt purpose. Accordingly, I would simply reverse the Court of Appeals, including its unauthorized order to stay the district court's ouster order, and I would affirm the district court's Judgment of Ouster.

First, the verdict form presented to the advisory jury asked the questions of whether it was highly probable that Morrison, "while in office, intentionally or purposefully engaged in misconduct in order to do wrong or cause injury to another," and "while in office, intentionally or purposefully neglected to perform any duty mandated by law in order to do wrong or cause injury to another." The jury answered those questions affirmatively. If a person acts or refuses to act "in order to do wrong or cause injury to another," that person's conduct must be deemed the product of a bad or corrupt purpose. In other words, a determination that Morrison's conduct was for the purpose of doing wrong or causing injury to another is the equivalent of finding that his conduct was for a bad or corrupt purpose.

Likewise, the district court specifically found that the evidence showed that Morrison "used city property for his own convenience," which was "a personal benefit to [Morrison]." The district court also made determinations about Morrison's lack of credibility in his excuses, which bolsters those findings. In my view, a public official who knowingly appropriates the public's property for the official's own personal benefit has acted for a corrupt purpose. Granted, as Morrison argued before us, there are instances of misappropriation of public property that are so de minimis that they should not support an ouster, *e.g.*, making a single personal photocopy on the city's machine. But that is where the district court's exercise of discretion comes into play; it does not negate the bad or

19

corrupt purpose of the action. Here, Morrison's actions went way past de minimis, and the district court's findings were sufficient to support its judgment. I would affirm.

BILES, J., joins in the foregoing dissent.